**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
**File Name: 06a0634n.06**
**Filed: August 24, 2006**

**No. 05-4151**

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

| | | |
|---|---|---|
| DONALD LONG; MANUEL PEDRO, | ) | |
| | ) | |
| Plaintiffs-Appellants, | ) | |
| | ) | ON APPEAL FROM THE UNITED |
| v. | ) | STATES DISTRICT COURT FOR THE |
| | ) | NORTHERN DISTRICT OF OHIO |
| FORD MOTOR COMPANY; DOMINIC | ) | |
| COLLETTA, | ) | |
| | ) | |
| Defendants-Appellees. | ) | |

Before: MOORE and GIBBONS, Circuit Judges; and ACKERMAN, District Judge.[*]

**JULIA SMITH GIBBONS, Circuit Judge**. Plaintiffs-appellants Manuel Pedro and Donald Long are longtime Ford Motor Company ("Ford") employees who both worked as mechanics in the major repair section at Ford's engine manufacturing facility in Brook Park, Ohio. Defendant-appellee Dominic Colletta managed the facility. Pedro and Long filed suit against Ford and Colletta, alleging that the defendants subjected them to a hostile work environment in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, 42 U.S.C. § 1981, and Ohio Revised Code § 4112.02 during their tenure at the major repair section. For the following reasons, we affirm the district court's grant of summary judgment for Ford and Colletta.

---

[*] The Honorable Harold A. Ackerman, United States District Judge for the District of New Jersey, sitting by designation.

1

I.

Pedro, who is of Hispanic descent, asserts that he was subject to a hostile work environment on account of his national origin, while Long, an African-American, makes identical claims on the basis of his race. As an initial matter, both Pedro and Long identified many instances of hostility before the district court. The court rejected most of these instances as a matter of law, however, and the plaintiffs have not challenged most of the court's determinations. As a result, we consider only the instances of hostility explicitly referenced on appeal.

Pedro bases his hostile work environment claim primarily on the use of derogatory names by his coworkers. Most of Pedro's allegations stem from interactions with Pat, a fellow mechanic in the major repair section.[1] Pedro testified in his deposition that Pat had called him a "wetback" and "Puerto Rican spic" on several occasions. Pedro did not report these statements to labor relations. Pedro did report Pat to labor relations after a dispute in which Pat called Pedro a "fat Puerto Rican," and a "fat motherfucking Puerto Rican" in the presence of a manager, Elvis, and the plant's general foreman, John Phillips.

Pedro further testified that John Arendash, a mechanic in the bay repair section, called him a "fucking Puerto Rican" during a dispute over whether major repair or bay repair had responsibility for repairing certain engines. Pedro did not report this incident initially but did do so when two other workers told labor relations personnel that Pedro had threatened Arendash.[2]

---

[1] Where the surnames of Ford employees are in the record, we use them. The surnames of several employees, however, are not in the record. In these cases, we use the first name.

[2] Pedro also notes that he heard "the n word" at work on one occasion, but he could not remember if it was uttered by a coworker. As this epithet did not refer to Pedro and is immaterial to his national origin claim, we do not consider it.

Pedro also alleges that he was wrongly moved, or "bumped," to a different job in the plant despite having more seniority than two white employees. Pedro does not identify these benefitted employees, provide any evidence that the "bumping" was in any way related to his national origin, or explain how "bumping" is related to his hostile work environment claim.

Long's assertions, like Pedro's, are based partly on derogatory comments made by coworkers. Unlike Pedro, however, Long does not assert that he ever heard racially insensitive remarks at work. Instead, Long's accusations are based on the testimony of his coworkers. One coworker, Philip Matovich, testified in his deposition that Long was called a "Black son of a bitch" and "Black bastard" in the presence of management, that Long and Matovich were threatened with physical violence, that Ford employees regularly used the "n word," and that Long and Pedro were consistently given a hard time at work. In addition, Long cites some evidence of allegedly racist behavior by Ford employees unrelated to Long. Long does not make clear how these incidents are related to his case, nor can the court consider them.[3] *See Burnett v. Tyco Corp*., 203 F.3d 980, 981 (6th Cir. 2000) (holding that the court can consider only those actions of which the plaintiff is aware).

Long also claims that he was harassed on account of his race in connection with the aforementioned dispute with the bay repair section. Long, a union coordinator, filed a grievance because his manager, Kevin Heck, diverted some engines to bay repair due to backups in the major repair division and the fact that bay repair had extra time. Long felt that he was harassed on account

---

[3] The allegations included testimony by Radine Brown, an African-American, who stated that two white employees pulled a knife on her and called her a "black bitch"; testimony by Harvey Wright, an African-American, who alleged that Ford employees made racial jokes; and a statement, not in the record, by Larry Finkley, an African-American, that he was repeatedly called "Boy" at work.

3

of race by filing the grievance, but admitted that the racial basis for the alleged harassment was merely speculative.

Long also claims that Andy Centilivre, a team manager, wrongfully refused him pay for an extra hour of work per day in connection with his coordinator position. He claims that white coordinators received this benefit even when they did not work the extra hour but that he was refused it. Long has presented no evidence other than his own speculation that this allegation is true, however, and also admits that Al Johnson, one of the managers who allegedly received the benefit, was also African-American.

Long also alleges that Centilivre harassed him by questioning him about a backup of engines in the major repair section. Long initially refused to talk to Centilivre, but eventually did consult with management and resolved the backup. Long asserts that he was treated with a lack of respect during the negotiation, but he was not disciplined and can show nothing more than speculation as support for his racial harassment allegation.

Finally, Long alleges that his supervisor, Mike Stepanik, discriminatorily told him not to use the office telephone during working hours when other employees were able to do so. Again, however, Long has no evidence of any racial motivation for Stepanik's actions, and identified several African-Americans among the employees that allegedly were permitted to use the telephone.

Long, as union coordinator, filed many grievances with labor relations regarding these and other disagreements between management personnel and himself and other major repair section mechanics. In none of these grievances, however, did Long ever assert that he was treated differently because of his race. Rather, Long's claims were directed at the conditions of employment and his relationships with managerial level employees.

4

Pedro and Long both assert a separate claim against Colletta in his individual capacity. Long and Pedro met Colletta only briefly, and neither alleges any explicit wrongdoing by the manager. Pedro spoke to Colletta on three occasions when he felt that the labor relations department was not adequately resolving an issue with a coworker. Colletta resolved Pedro's complaint. Long had less contact with Colletta; he once introduced himself and requested a meeting. Colletta agreed to meet with Long, but Long never followed through on his request. Both Pedro and Long, however, allege that Colletta acted wrongfully by failing to adequately control the employees at the plant. They assert that Colletta had final authority over all employee grievances and that he failed to act on Long's grievances. There is no evidence in the record, however, as to Colletta's general responsibility for labor relations grievances or his actions regarding the grievances in this case. As a result, Long and Pedro rely solely on Ford's "Zero Tolerance Policy" on harassment, which they argue required Colletta to take action to halt the harassment.

Long and Pedro did not file a complaint letter with the EEOC, instead filing suit in Ohio state court against Ford and Colletta. The suit alleged hostile work environment claims under Title VII, § 1981, and Ohio law. The defendants removed the case to the United States District Court for the Northern District of Ohio and moved for summary judgment on all causes of action. In their response to the defendants' motion for summary judgment, the plaintiffs asserted an additional cause of action for intentional infliction of emotional distress under Ohio law. The district court granted the motion in full. It held that because the plaintiffs failed to file an EEOC complaint, their Title VII complaint was barred. Plaintiffs do not appeal this issue and have therefore waived it. The court also rejected Pedro's § 1981 complaint, as § 1981 does not permit claims based on national origin. Pedro does not appeal this holding. The court then addressed the merits of Long's § 1981

5

claim and Long's and Pedro's Ohio § 4112 claims. It held that the plaintiffs failed to show "severe and pervasive" harassment sufficient to survive summary judgment and therefore granted judgment for Ford. The court also granted summary judgment for Colletta, noting that he never acted in a harassing manner, nor did he fail to respond when notified of problems by the plaintiffs. In addition, the court rejected the intentional infliction of emotional distress claim because, assuming that the complaint asserted such a claim, it was not so extreme as to support liability. Plaintiffs appeal.

## II.

This court reviews a district court's grant of summary judgment *de novo*. *Williams v. Mehra*, 186 F.3d 685, 689 (6th Cir. 1999).

Though the plaintiffs' Title VII claims are no longer before the court, the panel must nonetheless apply the Title VII framework to determine the outcome of the § 1981 and § 4112 claims. *Dews v. A.B. Dick Co.*, 231 F.3d 1016, 1021 n.2 (6th Cir. 2000). To prove a *prima facie* case of hostile work environment under § 1981 and § 4112, a plaintiff must show that: (1) he is a member of a protected class; (2) he was subjected to unwelcome harassment; (3) the harassment complained of was based on race or national origin;[4] (4) the harassment created a hostile work environment; and (5) the employer is liable. *Hafford v. Seidner*, 183 F.3d 506, 512 (6th Cir. 1999) ("The elements and burden of proof are the same, regardless of the discrimination context in which the claim arises."). A hostile work environment occurs "[w]hen the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Harris v.*

---

[4] As noted above, claims for hostile work environment based on national origin are not permitted under § 1981, but are available under § 4112.

6

*Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993) (internal quotation marks and citation omitted). Both an objective and subjective test must be met; in other words, the conduct must be so severe or pervasive as to constitute a hostile or abusive working environment both to a reasonable person and the actual victim. *Id.* at 21-22.

Rather than considering each event complained of in isolation, the panel must consider the totality of the circumstances in determining whether the harassment was sufficiently severe or pervasive. *Black v. Zaring Homes, Inc.*, 104 F.3d 822, 826 (6th Cir. 1997). Specifically, the court must consider "the frequency of the discriminatory conduct; its severity; whether it [was] physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interfere[d] with an employee's performance." *Harris*, 510 U.S. at 23. "[S]imple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment." *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998) (internal quotation marks and citation omitted). The panel may, however, consider the effect of the incidents on the employee's psychological well-being. *Harris*, 510 U.S. at 23.

While the conduct complained of by Pedro and Long is utterly deplorable, it was not pervasive enough to constitute a hostile or abusive working environment. The episodes of harassment identified by Pedro involved only two individuals in two discrete instances. Pat, the coworker who made racist remarks, was the worst offender, but Pedro reported these remarks to the labor relations department only once, and Pedro does not assert that Ford failed to respond to his complaint. Ford also investigated Pedro's confrontation with Arendash, though it did so only after notification by parties other than Pedro. These two instances cannot constitute "pervasive" harassment in the absence of other, ongoing misconduct about which the company failed to act. To

7

the contrary, these are the sort of "isolated incidents" that "will not amount to discriminatory changes in the terms and conditions of employment." *Faragher*, 524 U.S. at 788. Pedro's other assertions are either speculative or unrelated to his hostile work environment claim and therefore do not affect our conclusion.

The same analysis applies to the claims made by Long. Long's charges regarding harassment arising from union activity, the backup of the engines for repair and diversion of those engines to the bay repair section, and the use of the office telephone are immaterial, as are the additional incidents reported to Ford as grievances, because Long admits that he has no evidence whatsoever linking his coworkers' conduct to his race. In some cases Long has admitted that other African-Americans were given benefits that he alleges were denied him on account of race. Exclusion of these allegations forces Long to rely solely on the testimony from Matovich regarding racist statements by unnamed coworkers made in Long's presence. These comments, like those made to Pedro, are absolutely terrible and have no place in the workplace or elsewhere. However, they are not sufficiently pervasive to satisfy *Faragher*. As a result, Long has failed to allege a *prima facie* hostile work environment case against Ford, and his § 1981 and Ohio state law claims against Ford therefore fail.

The plaintiffs' claims against Colletta are similarly meritless. Under *Genaro v. Central Transport, Inc.*, 703 N.E.2d 782 (Ohio 1999), Colletta is liable for his own discriminatory conduct. There is no evidence, however, that Colletta was hostile to plaintiffs in any way. He responded to Pedro's complaints, and Long never even complained to him. Further, plaintiffs have produced not a scintilla of evidence that Colletta knew of and failed to act on any of the other asserted acts of harassment. Moreover, even if Long's unsupported allegation that Colletta was responsible for

8

responding to his grievances is correct, none of those grievances referenced harassment based either on Long's race or Pedro's national origin. As a result, plaintiffs cannot succeed on their claim against Colletta.

III.

Long's and Pedro's intentional infliction of emotional distress claims similarly cannot succeed. In order to prevail on a claim of intentional infliction of emotional distress, a plaintiff must prove that: 1) the defendants intended to cause the plaintiffs serious emotional distress; 2) the defendants' conduct was extreme and outrageous; and 3) the defendants' conduct was the proximate cause of the plaintiffs' distress. *Phung v. Waste Mgmt., Inc.*, 644 N.E.2d 286, 289 (Ohio 1994). The Ohio Supreme Court has adopted the Restatement (Second) of Torts comment requiring that conduct giving rise to an intentional infliction of emotional distress claim must be "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Yeager v. Local Union 20, Teamsters, Chauffeurs, Warehousemen & Helpers of Am.*, 453 N.E.2d 666, 671 (Ohio 1983) (quotation omitted). "Serious" emotional distress, moreover, must be "severe and debilitating." *Paugh v. Hanks*, 451 N.E.2d 759, 765 (Ohio 1983) (defining "serious" in the context of a negligent infliction of emotional distress claim").

The district court held that plaintiffs failed to show that Ford's or Colletta's conduct was extreme or outrageous. We agree. While the actions of the plaintiffs' coworkers were deeply troubling, there is no evidence that either Ford or Colletta knew of – or when they knew of, failed to respond to – the alleged abuse. As a result, we affirm the district court's grant of summary

9

judgment for the defendants on this issue.[5]

IV.

For the foregoing reasons, we affirm the district court decision.

---

[5] We note also that the defendants have argued that neither plaintiff properly provided the evidence of severe or debilitating harm resulting from the hostile work environment that is required to support a cause of action for intentional infliction of emotional distress.  As we find the defendants' conduct to be neither extreme nor outrageous, we need not address this issue.