DECISION. *Page 2 
{¶ 1} This is a case of alleged workplace discrimination. But if we were to decide that the isolated and indirect incidents here amounted to discrimination, no employer could run a business. The employer reacted promptly and properly to the incidents in question. The trial court was correct in granting summary judgment, and we affirm.
 {¶ 2} Plaintiff-appellant Karen Brown sued defendants-appellees Dover Corporation, OPW Fueling Components, and Richard Ogden (collectively "Dover"), and defendant Greg Pearson for racial discrimination and harassment. Brown dismissed Pearson from the suit in December 2005. About two months before Pearson was dismissed, Dover moved for summary judgment. The trial court granted Dover's motion, and this appeal followed.
 {¶ 3} Brown argues that she had established a prima facie case of disparate treatment, by showing that she had been denied the benefits (work gloves, overalls, personal and vacation days, and overtime hours) that Caucasian employees had received, and a hostile work environment, by showing that overtly racial pictures had been distributed, that a noose was found hanging at a coworker's desk, and that she had been subjected to constant surveillance, nitpicking criticism, and sarcastic remarks by Ogden. But because (1) Brown ultimately received the benefits she claims to have been denied, (2) the cited incidents attained neither the level of severity nor the frequency of occurrence to create an objectively hostile work environment, (3) Brown failed to complain to management, and (4) Dover promptly took corrective action, we affirm the summary judgment entered in Dover's favor. *Page 3 
 I. Brown's Employment at Dover {¶ 4} Brown was hired in March 1990. The alleged discrimination purportedly took place between 2000 and 2003. Brown sued in 2004. During her employment, Brown had worked in several different positions, under various supervisors. Brown was also a member of the Glass, Molder, Pottery, Plastics, and Allied Workers' International Union, and consequently her employment was governed by its collective-bargaining agreement.
 {¶ 5} In May of 1995, Brown was moved to the Pisces unit of the shipping department, where she worked under Ogden's supervision. The shipping department as a whole scheduled all employees for overtime almost every week. When Ogden did not need all of the employees to work overtime, he assigned overtime based on seniority, or he gave priority to employees who performed the function for which overtime was needed. Because the three employees in the Pisces unit performed the same function, there was no basis other than seniority on which to allocate voluntary overtime opportunities.
 {¶ 6} This action ostensibly arose from the disposition of a union grievance filed in August 2003. Brown claimed that Dover had discriminated against her based on her race because it had overlooked her for overtime opportunities. An investigation revealed that Brown stood second in receiving overtime in the department, and later the union withdrew the grievance. But Brown argued that her grievance was not based on the lack of overtime hours, but rather on Dover's ability to "sweep the entire matter under the carpet." The matters Brown claimed that Dover had swept under the carpet included incidents of perceived racial discrimination and harassment, along with the denial of benefits, racially offensive pictures, a noose incident, and increased criticism and surveillance. *Page 4 
 {¶ 7} In August 2003, an employee found racially offensive pictures in a drawer in the shipping department. The target of most of these pictures was Virgil Engleman. The pictures often depicted a transposed image of Engleman in various compromising positions, many of which implicated stereotypes of the African-American male anatomy or compared African-Americans to gorillas and other animals. The pictures were disgusting, to say the least.
 {¶ 8} Also, a noose was found hanging from a Dover employee's work station. Brown could not remember the date that the noose was found. In her 2005 deposition, she guessed that some years had passed since it had happened. Brown admitted that she did not complain to Ogden, but maintained that her silence was at the behest of one of her coworkers, who had asked her not to say anything because it was just a shipping department joke. Brown also alleged that, on learning about the noose, Ogden "didn't directly tell [the employee to take it down], he just said, 'whoever it belongs to needs to take it down.'" The record showed that the noose was taken down and disposed of shortly after Ogden learned of its existence.
 {¶ 9} Finally, Brown alleged that she had been subjected to increased scrutiny by Ogden.
 II. Summary-Judgment Standard {¶ 10} Before analyzing Brown's assignments of error, we note that a summary-judgment decision is reviewed de novo.[1] And when evaluating a decision granting summary judgment, we construe the evidence in a light most favorable to the non-moving party, in this case Brown.[2] *Page 5 
 {¶ 11} Here Dover was entitled to summary judgment if (1) there was no genuine issue of material fact; (2) it was entitled to judgment as a matter of law; and (3) it appeared that reasonable minds could come to but one conclusion when viewing the evidence in Brown's favor and that conclusion was adverse to her.[3]
 {¶ 12} The summary-judgment standard placed the burden on Dover as the moving party to identify "those portions of the record that demonstrate[d] the absence of a genuine issue of material fact on the essential elements of [Brown's] claims."[4] Once the moving party discharges that burden, the nonmoving party then has "a reciprocal burden to set forth specific facts by the means listed in Civ. R. 56(E) to show that a triable issue of fact exists."[5]
 {¶ 13} Brown's single-count complaint alleged race-based discrimination.[6] Under the Ohio Fair Employment Practices Act (OFEPA), it is an unlawful discriminatory practice "[f]or any employer, because of race * * * to discharge without just cause, to refuse to hire, or otherwise to discriminate against that person with respect to hire, tenure, terms, conditions, or privileges of employment, or any matter directly or indirectly related to employment."[7]
 {¶ 14} From Brown's complaint, it is unclear whether her OFEPA cause of action was based on disparate treatment[8] or a hostile work environment,[9] but the evidence presented could have arguably implicated either theory. The denial of benefits and increased scrutiny suggested a disparate-treatment theory, but the distribution of racially offensive pictures and the noose supported a hostile-work-environment theory of racial *Page 6 
harassment. The trial court ruled that Brown's claim failed as a matter of law regardless of the theory asserted. In January 2006, when the trial court granted summary judgment, Brown was still employed at Dover and had been promoted to a lead position.
 II. Prima Facie Case {¶ 15} A plaintiff alleging disparate treatment under R.C. 4112.02 may prevail by presenting either direct or indirect evidence that the employer was motivated by a race-based animus when the adverse employment action took place. Where no direct evidence exists, an employee must proceed under the burden-shifting, indirect-evidence approach announced in McDonnell Douglas Corp. v. Green.[10] Under theMcDonnell Douglas framework, the employee bears the initial burden of demonstrating a prima facie case of discrimination.
 {¶ 16} To make her prima facie case of race discrimination, Brown had to show that she was a member of a protected class, was qualified for her position, suffered an adverse employment action or was terminated, and was treated disparately from similarly situated nonminority employees.[11] The trial court ruled that Brown was unable to show that she had been subjected to an adverse employment action, and therefore that she could not establish her prima facie case. Accordingly, Brown's disparate-treatment claim hinged on whether she had suffered an adverse employment action under OFEPA.
 III. The Alleged Denial of Benefits and IncreasedScrutiny {¶ 17} On appeal, Brown argues that the denial of gloves, overalls, personal and vacation days, and overtime, in conjunction with Ogden's increased scrutiny, amounted to an adverse employment action and ultimately to disparate treatment. *Page 7 
 {¶ 18} In opposing Dover's summary-judgment motion, Brown offered various allegations, which she claimed as a whole constituted an adverse employment action. Brown also presented various self-serving affidavits from fellow employees, many of which simply mirrored her own statements.
 {¶ 19} In December 2002, Brown noticed that Ogden had received a packet of new work gloves and had given several pairs to coworkers. Brown routinely wore gloves to protect her hands. When she asked Ogden for a pair of the gloves, he refused to give them to her. The transcript showed that Dover had made the gloves available to employees through its supervisors. The same day Brown's glove request was denied, she had asked for, and received, gloves from a different supervisor. In another similar occurrence, Ogden had refused to give Brown a pair of overalls, but she again received them the same day the request was initially denied.
 {¶ 20} Brown also asserted that she had to take extraordinary measures to receive overtime hours because she had to solicit coworkers to give her their surplus overtime hours beyond the mandatory overtime hours. She also asserted that she was not considered for an open promotion in early 2003. Brown ultimately received a promotion, but not until August 2004.
 {¶ 21} Brown claimed that she was subjected to more rigid scrutiny by Ogden than Caucasian employees. She claimed that Ogden frequently criticized her for talking with other employees or for leaving her work area, while overlooking that same conduct in Caucasian coworkers. Brown also alleged that on August 8, 2002, Ogden had refused to allow her to work through lunch, but that two weeks later he allowed a Caucasian employee to do just that.
 {¶ 22} In another incident, Ogden talked to Brown about taking a call on her cellular phone. The next day, a Caucasian employee took a 20-minute call, but *Page 8 
Ogden, who was standing nearby, saw the employee on the phone and said nothing. She further claimed that under company practice an employee could call up to 15 minutes before the start of his or her shift and take a personal or sick day, provided that no more than four employees were off on the same day; and that Ogden had allowed Caucasian employees to take as much time off as they wished in accordance with that policy, but that the same courtesy was not extended to her. She claimed that she would call in and request time off, but Ogden would tell her to come to work, and, on arrival, she would find that there were fewer than four employees off work, or that Ogden had allowed a Caucasian employee to leave work early.
 {¶ 23} Finally, Brown claimed that, in August 2002, Ogden had canceled her previously scheduled vacation, while simultaneously allowing a Caucasian employee with less seniority to take the week off. According to Brown, Ogden justified his decision on the basis that the Caucasian employee had asked for five days off, whereas Brown had only asked for four days' vacation. Though Ogden told Brown that she could not take her vacation, Brown proceeded to take the vacation without authorization and was never reprimanded.
 {¶ 24} The trial court rejected Brown's arguments, and in entering summary judgment in Dover's favor, it noted that Brown had received each of the benefits despite the perceived inconvenience in obtaining them. The court also found that Brown stood second in the department in receiving overtime hours — and that although Ogden had overlooked Brown for the promotion to the lead-person position, Brown admitted she had never expressed an interest in the open position. The trial court concluded that the instances cited by Brown had no significant effect and were ephemeral, and that they did not constitute an adverse employment action. *Page 9 
 IV. The Scope of OFEPA Mirrors Title VII {¶ 25} On appeal, Brown also asserts that the trial court erroneously adopted a standard requiring an employment-discrimination plaintiff to "show a significant change in employment status." Essentially, she argues that the additional language found in OFEPA affords Ohio's citizenry greater protection than Title VII of the Civil Rights Act.[12] Title VII prohibits race-based discrimination against any employee with respect to "compensation, terms, conditions or privileges of employment,"[13] whereas OFEPA prohibits discrimination with respect to "hire, tenure, terms, conditions, or privileges of employment, or any matter directly or indirectly related toemployment."[14] Brown argues that the added language in OFEPA, prohibiting discrimination with respect to "any matter directly or indirectly related to employment," expands the scope of OFEPA's protection beyond that of Title VII. Not so.
 {¶ 26} Generally, federal case law interpreting Title VII is applicable to discrimination cases under OFEPA.[15] In Kimble v.Intermetro Industries, a federal district court announced that OFEPA's reach mirrors that of federal discrimination statutes: "The Ohio Supreme Court has held that the scope of § 4112.02(A) is identical to that of federal anti-discrimination statutes."[16] The Kimble court further stated that "evidence sufficient to support a finding of discrimination under Title VII of the Civil Rights Act of 1964 is necessary before a[n] [OFEPA violation] can be found."[17] On these facts, we hold that OFEPA reached no further in its purview than did Title VII. Thus, Brown's case turned on whether she had been subjected to an adverse employment action under Title VII and OFEPA jurisprudence. *Page 10 
 V. What is an Adverse Employment Action? {¶ 27} Generally, to demonstrate that an adverse employment action has occurred, a plaintiff must show that the employer's conduct caused a "materially adverse change in the terms and conditions of employment."[18] The federal Sixth Circuit Court of Appeals has determined that a "materially adverse change" means something more than mere inconveniences: "[A] materially adverse change in the terms and conditions of employment must be more disruptive than a mere inconvenience or an alteration of job responsibilities. A materially adverse change might be indicated by a termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices that might be unique to a particular situation."[19]
 {¶ 28} The Sixth Circuit has also announced that "reassignments without changes in salary, benefits, title, or work hours usually do not constitute adverse employment actions."[20]
 {¶ 29} Brown asserts that because she had to "fight" to obtain certain benefits, she suffered an adverse employment action. But the Davis,Hollins, and Policastro line of cases strongly suggest that, to constitute an adverse employment action, the employer's conduct must go beyond temporary inconveniences. And any change in status must be significant and material. De minimis employment actions are not materially adverse and, thus, not actionable.[21] An adverse employment action does not necessarily require pecuniary loss, such as termination, a decrease in *Page 11 
salary, or a loss of benefits, but the action must materially affect the terms and conditions of the plaintiffs employment.[22]
 {¶ 30} Though inconvenience in obtaining benefits can militate in favor of a finding that an adverse employment action has taken place, in this case, the conduct Brown complained of was transient, impermanent, and minimal. The record clearly demonstrates that Brown received both the gloves and the overalls the same day that the "benefits" had initially been denied.
 {¶ 31} Brown's allegation that excess overtime hours were disparately allocated based on race is likewise meritless. She again argues that it was more difficult for her to obtain the excess overtime hours than it had been for other employees. It is undisputed that Brown was second in the shipping department in overtime hours worked. And she offered no evidence to support her assertion that race-based discrimination was a motivating factor in the allocation of overtime. This very issue was investigated, and disposed of, by the union. Additionally, the record is devoid of evidence showing that other employees were not likewise required to solicit coworkers to secure excess overtime hours.
 {¶ 32} Brown's allegation that Dover had failed to promote her carried little weight where she had failed to express an interest in the open position. Moreover, while this litigation was pending, Brown received a raise. Brown also alleges that Ogden had revoked her planned vacation days, favoring another employee instead. But the record demonstrates the Brown took her vacation and was not punished for her insubordination.
 {¶ 33} Brown's final argument in support of her disparate-treatment claim is that Ogden more closely scrutinized her (and other African-American employees) than he did other (Caucasian) employees. Again, the only evidence Brown presented in support of her *Page 12 
accusation was a flurry of self-serving affidavits from coworkers that merely reiterated her own allegations. Moreover, even if Brown had been subjected to increased scrutiny, the allegations here did not amount to a cognizable adverse employment action.[23]
 {¶ 34} Brown's allegations that she was treated differently than similarly situated Caucasian employees and other coworkers outside of the protected class were conclusory and unsubstantiated. For instance, Brown's claim that she had been denied vacation and personal days where other Caucasian employees were permitted to freely take time off was a speculative and subjective belief based mainly on workplace gossip. Brown also failed to introduce evidence connecting the employment actions complained of to race-based discrimination; and she failed to show that Caucasian employees and other coworkers outside of the protected class did not have to cut through the same red tape to receive benefits.
 {¶ 35} We hold that the denial of benefits that were ultimately received amounted to nothing more than a de minimis employment action. And even if we construe the alleged facts in a light most favorable to Brown, the sum of the employment actions on which she relied did not amount to an adverse employment action for purposes of OFEPA or Title VII. Any perceived favoritism that was shown to other employees could have been attributed to a whole host of factors unrelated to race. In sum, the alleged inconveniences in obtaining benefits and increased scrutiny could not have been construed to constitute a tangible detriment to her employment. Because Brown did not suffer an adverse employment action, her prima facie case under a disparate-treatment theory failed as a matter of law.
 {¶ 36} Accordingly, we conclude that the trial court properly granted summary judgment to Dover on Brown's disparate-treatment claim. *Page 13 
 VI. Hostile Work Environment {¶ 37} Brown also alleges she was subjected to a hostile work environment because, in concert with the disparate-treatment allegations, (1) Dover allowed unknown employees to post a series of racially offensive pictures, and (2) a noose had been hung at a coworker's station. Under the Revised Code, a plaintiff alleging a hostile work environment must establish that (1) the employee was a member of a protected class, (2) the employee was subject to unwelcome harassment, (3) the harassment complained of was based on race, (4) the harassment had the purpose or effect of unreasonably interfering with the employee's work performance or creating an intimidating, hostile, or offensive work environment, and (5) respondeat superior liability existed.[24]
 {¶ 38} A hostile work environment violative of federal and state law is one that is permeated "with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment."[25] The conduct must be both subjectively and objectively severe and pervasive; that is, it must be offensive both to a reasonable person and the actual victim.[26] We consider Brown's allegations in support of her hostile-work-environment claim in the conjunctive, deciding whether, under the totality of the circumstances, the alleged harassment was sufficiently severe or pervasive.[27]
 {¶ 39} Some factors to consider in analyzing whether the conduct complained of is actionable under Title VII or OFEPA include the frequency and severity of the conduct, whether the conduct is physically threatening or humiliating as opposed to *Page 14 
being a merely offensive utterance, whether the conduct unreasonably interferes with an employee's work performance, and whether psychological harm results.[28]
 {¶ 40} On appeal, Brown argues that the trial court erroneously minimized the effect of the derogatory pictures that were found. She argues that the evidence supporting her disparate-impact claim, in combination with the dissemination of racially offensive pictures and the noose incident, created a hostile work environment.
 {¶ 41} Brown's appellate brief goes to great lengths to reiterate each instance of perceived discrimination in attempting to cobble together a sustainable harassment claim. As we have already concluded, the evidence Brown has cited in support of her disparate-impact claim amounted to nothing more than de minimis inconveniences, and the racially-offensive pictures and noose added little to her claim.
 {¶ 42} The trial court found that neither the racially-offensive pictures nor the noose incident were directed at Brown. And Brown admits as much. Moreover, the record failed to show that Ogden or management played any part in either incident. Brown's deposition revealed that she had never complained to management about the pictures and had no idea who had posted them. She further stated that she had not seen the pictures in years.
 {¶ 43} After Dover was made aware of the existence of the racially offensive pictures, it investigated the incident. Dover made its employees aware that such conduct was intolerable, and that any further infractions would result in termination of employment. Similarly, when Ogden discovered that the noose had been hung, it was promptly removed.
 {¶ 44} We also note that the allegations of discrimination scattered before us display a temporal disconnection that weighed against a finding of discrimination.
See Peterson v. Buckeye Steel Casings, supra. *Page 15 
The incidents complained of were isolated and ephemeral, and their effect on employment was minimal. In this case, the dots don't connect. The noose incident occurred around 2000 or 2001. Brown never reported the incident to management. Her coworkers likewise failed to report anything about the noose.
 {¶ 45} When the racially offensive pictures were found in August of 2003, Brown testified, she had not seen them in years, and she did not think any of them were directed at her. And as we have already noted, as soon as management learned about the pictures, remedial action was promptly taken. The employees involved in these isolated instances remained nameless. And no evidence suggested that Dover management either condoned or participated in the offensive conduct. Rather, management responded by informing employees that such pictures were inappropriate, and that those found posting racially offensive pictures would be fired.
 {¶ 46} We hold that Brown failed to demonstrate that she had been subjected to a hostile work environment. The perceived inconveniences in obtaining benefits, the heightened scrutiny, the racially offensive pictures, and the noose incident did not, as a matter of law, establish an actionable hostile-work-environment claim. And the fact that Brown failed to report the incidents to management weighed against a finding that the conduct complained of constituted a hostile work environment. While the conduct complained of was unquestionably distasteful, it was not sufficiently severe or pervasive to constitute a hostile or abusive working environment.
 VI Summary Judgment Proper {¶ 47} Brown failed to establish a prima facie case of race-based discrimination. Brown's harassment claim likewise failed because the conduct complained of was neither pervasive nor severe enough to be actionable under OFEPA. And even if Brown could have established a prima facie case, Dover *Page 16 
successfully showed that it had taken immediate corrective action once it had learned of the alleged abuses (the inconveniences, the pictures, and the noose). Thus we affirm the trial court's entry of summary judgment in Dover's favor.
Judgment affirmed.
HENDON and CUNNINGHAM, JJ., concur.
[1] See Hollingsworth v. Time Warner Cable, 157 Ohio App.3d 539, 546,2004-Ohio-3130, 812 N.E.2d 976, citing Doe v. Shaffer,90 Ohio St.3d 388, 390, 2000-Ohio-186, 738 N.E.2d 1243.
[2] See Harless v. Willis Day Warehousing Co. (1978),54 Ohio St.2d 64, 375 N.E.2d 46.
[3] See Hollingsworth, supra, citing Grafton v. Ohio Edison Co.,77 Ohio St.3d 102, 105, 1996-Ohio-336, 671 N.E.2d 241.
[4] See id., quoting Dresher v. Burt, 75 Ohio St.3d 280, 293,1996-Ohio-107, 662 N.E.2d 264; see, also, Civ. R. 56(C).
[5] See id., quoting Morris v. Ohio Cas. Ins. Co. (1988),35 Ohio St.3d 45, 47, 517 N.E.2d 904.
[6] See R.C. 4112.02(A).
[7] See id.
[8] See Shepard v. Griffin Services, Inc., 2nd Dist. No. 19032, 2002-Ohio-2283.
[9] See Tarver v. Calex Corp. (1998), 125 Ohio App.3d 468,708 N.E.2d 1041.
[10] (1973), 411 U.S. 792, 93 S.Ct. 1817.
[11] See Plumbers Steamfitters Joint Apprenticeship Commt. v. OhioCiv. Rights Comm. (1981), 66 Ohio St.2d 192, 197, 421 N.E.2d 128.
[12] See Section 2000(e) et seq., Title 42, U.S. Code.
[13] See id.
[14] See R.C. 4112.02(A) (emphasis ours).
[15] See Steamfitters Joint Apprenticeship Commt. v. Ohio Civ. RightsComm., supra.
[16] See Kimble v. Intermetro Indus. (N.D.Ohio 2003),288 F. Supp. 2d 876, 879, citing Steamfitters Joint Apprenticeship Commt. v.Ohio Civ. Rights Comm., supra.
[17] See Steamfitters Joint Apprenticeship Commt. v. Ohio Civ. RightsComm., supra.
[18] See Davis v. Cleveland, 8th Dist. No. 83665,2004-Ohio-6621, quoting Kocsis v. Multi-Care gt., Inc. (C.A.6, 1996),97 F.3d 876, 885.
[19] See Hollins v. Atlantic Co. (C.A.6, 1999), 188 F.3d 652, 662;Kocsis, supra; Bowman v. Shawnee State University (C.A.6, 2000),220 F.3d 456, 462; see, also, Peterson v. Buckeye Steel Casings (1999),133 Ohio App.3d 715, 729 N.E.2d 813.
[20] See Policastro v. Northwest Airlines, Inc. (C.A.6, 2002),297 F.3d 535, citing Kocsis, supra.
[21] See, e.g., Bowman, supra, 220 F.3d at 462.
[22] See Mowery v. Columbus, 10th Dist. No. 05AP-266,2006-Ohio-1153, at ¶ 22, citing Hart v. Columbus Dispatch/DispatchPrinting Co., 10th Dist. No. 02AP-506, 2002-Ohio-6963.
[23] See, e.g., Howard v. Board of Education (C.A.6, 2003), 70 Fed.Appx. 272.
[24] See Delaney v. Skyline Lodge, Inc. (1994), 95 Ohio App.3d 264,270, 642 N.E.2d 395; see, also, Long v. Ford Motor Co. (C.A.6, 2006), 193 Fed.Appx. 497.
[25] See Harris v. Forklift Systems, Inc. (1993), 510 U.S. 17,114 S.Ct. 367 (internal quotation marks and citation omitted).
[26] See Harris, supra, 510 U.S. at 21-22.
[27] See Long, supra, 193 Fed.Appx. at 501, citing Black v. ZaringHomes, Inc. (C.A.6, 1997), 104 F.3d 822, 826.
[28] See Peterson v. Buckeye Steel Casings, supra. *Page 1