NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 13a0371n.06

No. 12-4103

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

| | | |
|---|---|---|
| MARY JANE COLSTON, | ) | **FILED**<br>*Apr 15, 2013*<br>DEBORAH S. HUNT, Clerk |
| | ) | |
| Plaintiff-Appellant, | ) | |
| | ) | |
| v. | ) | ON APPEAL FROM THE |
| | ) | UNITED STATES DISTRICT |
| CLEVELAND PUBLIC LIBRARY; | ) | FOR THE NORTHERN |
| FELTON THOMAS; MELVIN | ) | DISTRICT OF OHIO |
| ABRAMS, Individually and as Asst. | ) | |
| Chief of Security; MICHAEL JANERO; | ) | |
| SHARON TUFTS; and JOHN DOE(S), | ) | |
| 1-20, | ) | |
| | ) | |
| Defendants-Appellees. | ) | |

BEFORE: MARTIN, SUHRHEINRICH, and COLE, Circuit Judges.

SUHRHEINRICH, Circuit Judge.

BACKGROUND

In this case, Plaintiff Mary Jane Colston ("Colston"), a security officer who continues in her employment with Defendant Cleveland Public Library, alleges that the Library and its individual employees Felton Thomas, Michael Janero and Sharon Tufts, (collectively, "Library"), as well as the Library's former Assistant Chief of Security, Melvin Abrams ("Abrams"), sexually harassed her, retaliated and discriminated against her on account of her gender, and intentionally inflicted emotional distress on her. The Library and Abrams made separate motions for summary judgment,

1

which Colston opposed both motions. The district court granted summary judgment to both the Library and Abrams. For the following reasons, we AFFIRM.

**STATEMENT OF FACTS**

**A.      Colston's Hiring**

The Library hired Colston on June 9, 2008, as an officer in its security department. Abrams, the former Assistant Chief of Security, favorably forwarded an endorsement for hiring Colston to the Library management. Defendant Michael Janero, the former Chief of Security, approved Abrams' recommendation to hire Colston. At the same time, the Library hired male Joseph Smith as an Officer. Colston and Smith started working for the Library on June 9, 2008. From Colston's date of hire until the filing of her complaint, the Library did not hire any other officers. Colston, along with the other Library security officers, was supervised by Abrams, the Assistant Director of Security.

All officers are union employees and are represented by Teamsters Local Union 244 (the "union"). The collective bargaining agreement ("CBA") between the Library and the union governs the shift schedules and seniority in the department. Pursuant to the CBA, officers bid for their shifts based on seniority, which are then maintained for a year. Because Colston and Smith started on the same day, seniority was governed by birth year. Colston's birth year came after Smith's, so she was the security officer with the least seniority in the department.

**B.      The Layoff**

On June 6, 2010, because of budgetary restrictions, the Library laid off the two officers with the lowest seniority—Smith and Colston. The Library conducted the layoff in accordance with the CBA. The union did not file a grievance on Colston's behalf challenging the layoff. In fact, the

members of the union voted on a proposal for either all officers to accept several unpaid furlough days or for the Library to lay off two officers. The officers turned down the furlough days, necessitating the layoff of two of their fellow union members.

On November 16, 2010, the Library recalled Colston and Smith back to work, in compliance with the CBA. Colston remains employed by the Library today. Defendants Tufts, Abrams, and Janero no longer work for the Library. Tufts retired on June 3, 2011, Abrams resigned on June 27, 2011, and Janero retired on June 4, 2010.

## C. Colston's Complaints to the Library

Colston alleges that during her employment with the Library, her coworkers subjected her to sexually offensive and otherwise harassing conduct. Her complaints are as follows.

### 1. Undocumented Complaints

Colston alleges that during the first few months of her employment, she complained to Abrams about the profanity he used during roll call in front of all the officers. She also claims that she made a complaint to Felton Thomas, the Library's Chief Executive Officer and Executive Director, "midway or ending of 2008." However, Thomas did not start working at the Library until January 19, 2009. Neither complaints were documented, nor does Colston offer evidence of either complaint.

### 2. Library Investigation of Officer Dycks

On August 21, 2009, security officer Eugene Dycks made a verbal threat about Ms. Colston to another officer. Janero and Tufts investigated the incident, and on September 24, 2009, suspended Dycks for one week. Dycks was not allowed to return to work until he completed training with the

3

Library's Employee Assistant Program. Colston declined to press criminal charges against Dycks because she did "not want[ ] to put Dycks' financial situation into hardship."

### 3. First Library Investigation of Abrams

On November 4, 2009, Colston complained to Tim Diamond, the Assistant to the Library's Director, that inappropriate language was being used in the security department, and that she felt she was in a hostile work environment. The Library hired an outside investigator. She had discovered that Abrams used inappropriate language, made sexual innuendoes, and revealed employees' personal information. The Library suspended Abrams for five days. The Library also issued a "Counseling Memo" to Defendant Janero, for failing "to step in to stop the unacceptable conduct," and for letting it be widely know that he was "not partial to women officers."

### 4. Second Library Investigation of Abrams

In April 2011, Colston made a second formal complaint, and met with the Library Director, Defendant Felton, as well as Defendant Tufts, the Library Human Resources Administrator. Colston told Felton and Tufts that her coworkers, including Abrams, were threatening and intimidating her.

Again, the Library hired an outside investigator and eventually concluded the Abrams had violated workplace policies. The Library placed Abrams on administrative leave and scheduled a pre-termination hearing. Abrams resigned before the hearing ended.

## STATEMENT OF THE CASE

Colston filed a Complaint in the Cuyahoga County Court of Common Pleas against the Library Defendants, and a former employee of the Library, Abrams. Colston asserted the following six counts: (1) sexual discrimination and harassment in violation of Ohio Revised Code ("R.C.") Chapter 4112; (2) negligent hiring, retention, supervision, and training under Ohio common law; (3)

retaliation in violation of R.C. Chapter 4112; (4) intentional infliction of emotional distress under Ohio common law; (5) violation of substantive and procedural due process rights under the Fifth and Fourteenth Amendments to the United States Constitution; and (6) gender discrimination and harassment in violation of Title VII, the Civil Rights Act of 1964, 42 U.S.C. § 2002e-2.

The Library and Abrams timely removed the case to the United States District Court for the Northern District of Ohio (the "district court"). After the conclusion of discovery, the Library and Abrams filed separate motions for summary judgment. The district court granted summary judgment to both the Library and Abrams, dismissing Colston's entire complaint. The district court stated that Colston had failed to identify any record evidence demonstrating a genuine issue of material fact.

## ISSUES ON APPEAL

(1)     Whether the district court properly dismissed Colston's sexual discrimination and hostile work   environment claims with respect to both the Library and Abrams.

(2)     Whether the district court properly dismissed Colston's negligent hiring, retention, supervision, and failure to train claims with respect to both the Library and Abrams.

(3)     Whether the district court properly dismissed Colston's retaliation claims with respect to both the Library and Abrams.

(4)     Whether the district court properly dismissed Colston's intentional infliction of emotional distress claims with respect to both the Library and Abrams.

(5)     Whether Colston waived her Fifth and Fourteenth Amendment claims by failing to oppose summary judgment on those claims.

5

## ANALYSIS

### A.      Standard of Review

The Sixth Circuit reviews a district court's grant of summary judgment de novo.  *Therma-Scan, Inc. v. Thermoscan, Inc.,* 295 F.3d 623, 629 (6th Cir. 2002).  "Summary judgment is proper when there exists no geunine issue of material fact and the moving party is entitled to judgment as a matter of law."  *Id.* (citing Fed. R. Civ. P. 56(c)).  Summary judgment must be entered against the nonmoving party if she "fails to make a showing sufficient to establish the existence of an element essential to . . . [her] case, and on which . . . [she] will bear the burden of proof at trial."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  It is insufficient simply to show that there is some "metaphysical doubt as to the material facts."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).  The "mere existence of a scintilla of evidence in support of [the plaintiff's] position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff."  *Id.*

In deciding a motion for summary judgment, the court "considers the facts in the light most favorable to the nonmoving party and draws all reasonable inferences in favor of the nonmoving party."  *LensCrafters, Inc. v. Robinson*, 403 F.3d 798, 802 (6th Cir. 2005).

### B.      Gender Discrimination and Hostile Work Environment Based on Gender

In Count 1, Colston alleges sexual discrimination and harassment in violation of R.C. § 4112.02, and in Count 6, Colston alleges sexual discrimination and harassment in violation of Title VII, the Civil Rights Act of 1964, and 42 U.S.C. § 2002e-2.  Title VII and Ohio state law claims are subject to the same standards.  The "prima-facie case requirements are essentially the same under Ohio Revised Code § 4112.02 . . . [so the] federal and state-law claims of gender discrimination may be disposed of together."  *Knox v. Neaton Auto Prods. Mfg., Inc.*, 375 F.3d 451, 457 (6th Cir. 2004)

6

(citation omitted). "Ohio courts apply federal case law interpreting Title VII of the Civil Rights Act of 1964 to claims arising under R.C. Chapter 4112 to the extent that the terms of the statutes are consistent." *Birch v. Cuyahoga Cty. Probate Ct.*, 173 Ohio App. 3d 696 (Ohio Ct. App. 2007), at ¶ 20.

Individual Defendants Thomas, Janero, Tufts, and Abrams cannot be held personally liable under Title VII. *Wathen General Elec.*, 115 F.3d 400, 405-06 (6th Cir. 1997). "[A]n individual employee/supervisor, who does not otherwise qualify as an 'employer,' may not be held personally liable under Title VII." *Id.* Therefore, the district court properly dismissed Colston's Title VII and R.C. § 4112.02 claims against Thomas, Janero, Tufts, and Abrams. All that remains is Colston's claim against the Library, which also ultimately fails.

### 1. Gender Discrimination

Title VII prohibits "discriminat[ion] of against any individual with respect to compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). "Title VII does not prohibit all verbal or physical harassment in the workplace; it is directed only at *discrimination* because of sex." *Oncale v. Sundowner Offshore Servs., Inc.,* 523 U.S. 75, 80 (1998) (citations omitted). Likewise, to establish "hostile environment sexual harassment under R.C. § 4112, [Colston] must establish that . . . the harassment was based on sex." *Id.* at 459. In other words, Colston must establish that she "was treated differently than similarly situated" male security guards. *Knox,* F.3d at 456-57. Colston advances six different ways that she allegedly suffered from gender discrimination.

First, Colston alleges that Abrams engaged in "unprofessional" behavior by his use of insults and profane language. However, Colston fails to argue that the demeaning statements were only

7

directed at females. Instead, she states that Abrams was insulting and profane with the male officers as well, calling them "imbeciles" and "idiots," commenting on their personal lives, commenting on their manliness, and commenting on their weight. Colston testified that Abrams "just basically emasculated the men right in front of me . . ." Therefore, Colston's own evidence suggests that Abrams' demeaning statements were not based on gender.

Second, Colston alleges that Abrams made comments about her physical appearance on two separate occasions. First, Colston claims that Abrams encouraged her to obtain a membership at a nearby gym. Second, Colston claims that when she asked Abrams for a larger pair of pants, Abrams responded, "you don't have a problem wearing those little tight pants you wear when you are not working." However, Colston admits that Abrams repeatedly made comments about the physical appearance of other male officers, including that they were overweight and looked sloppy in their uniforms.

Third, Colston claims that Abrams discussed female Library employees with whom he had been intimately involved. However, Colston never identified the female employees, nor does she allege that Abrams never had similar discussions with male officers. Colston also argues that Abrams indicated indirectly that if she were open to the opportunity for sex, that he would also be open to it. However, she acknowledges that any indication Abrams gave was "indirect," and that he did not verbalize these thoughts. Colston also recounts one incident when, as Colston and Abrams walked into a room, Abrams said, "I got to watch you, you might be trying to take me in places I don't need to be going, I got to be careful with you." However, in order to be a cognizable claim, the discrimination "must be severe and pervasive." *Knox*, 375 F.3d at 459. This one incident is not enough for Colston's claim.

8

Fourth, Colston points to one instance when she came across "pornographic" reading materials in an office where she sometimes worked. The reading materials belonged to the Library, but had not been checked out for use. Colston reported the incident to Abrams, and the reading materials were promptly returned to the Library shelves. Abrams issued a memorandum to all security department employees, asking them to keep all personal items, including reading materials, in their personal lockers and not placed in areas where other employees could see them. Although Colston claims in her affidavit that officers "continue to leave sexual magazines in places where they know I will find them," she acknowledges in deposition that this was an isolated incident, and that she did not regularly work in the office where the reading material was found.

Fifth, Colston alleges that Abrams touched her in early 2009, when they were standing by a doorway, and Abrams' body "brushed up" against her breasts in passing. Colston testified that the reason she did not report the incident to the Library was because she did not believe that Abrams did it intentionally.

Lastly, Colston argues that Abrams once refused her request to switch her days off, but regularly switched a male officer, Smith's, days off. However, Smith testified that he never requested switches, and that being involuntarily switched actually inconvenienced him. Furthermore, the CBA permitted Abrams to switch Smith's days off and not Colston's because of a seniority-based bidding system on shifts. Colston also argues that Abrams singled her out for discipline without just cause. However, there is documented evidence that Abrams also wrote up male officers unjustifiably when he wished to hinder their job opportunities.

9

## 2. Hostile Work Environment

To prevail on a hostile work environment claim based on gender, Colston must establish that she was subjected to harassing conduct that was: (1) unwelcome; (2) based on sex; (3) sufficiently severe or pervasive to affect the terms, conditions, or privileges of her employment; and (4) either (a) committed by a supervisor, or (b) conduct the employer knew or should have known about and failed to take immediate and appropriate corrective action. *Bowman v. Shawnee State Univ.*, 220 F.3d 456, 462-63 (6th Cir. 2000).

Colston has not offered any evidence or arguments that the Library did not take immediate and appropriate corrective action, and therefore, her hostile work environment claim fails as a matter of law. The Library has anti-harassment and anti-discrimination policies in its Human Resources Manual. The Library also trains employees to prevent harassment and report any purported incidents of harassment. The first time that Colston formally complained, the Library hired Lynette Rodgers, an independent investigator, to look into Colston's claims. Colston testified that she felt comfortable with Rodgers. As a result from the investigation, the Library gave Abrams a five-day unpaid disciplinary suspension, wrote that any similar action could result in termination, and issued Janero a memorandum for failing to stop Abrams' unacceptable behavior. The second time that Colston formally complained, the Library promptly hired Diane Citrino, an attorney and the former Regional Director of the Ohio Civil Rights Commission, to independently investigate Colston's claims. Colston testified that she was comfortable with Citrino. As a result of the investigation, Abrams was placed on administrative leave. Abrams resigned before his pre-termination hearing.

Therefore, Colston's state and federal claims of federal claims of sexual discrimination, harassment, and hostile work environment cannot survive summary judgment.

10

**D.     Negligent Hiring, Retention, Supervision, and Failure to Train**

Colston's Ohio state-law claim for negligent hiring, retention, supervision, and failure to train ("negligent hiring") fails as a matter of law. Because the negligent hiring claim can only be asserted against the Library, and not individuals, the district court correctly held that Colston cannot pursue such a claim against Thomas, Janero, Tufts, or Abrams. *See Fulst v. Thompson*, 2009 U.S. Dist. LEXIS 109085, at *13-14 (S.D. Ohio Nov. 20, 2009). This means that the only remaining defendant is the Library, but Colston's claim against the Library ultimately fails as well.

In order to prevail on a negligent hiring claim, Colston must show that an accused employee be individually liable for a tort against Colston, who then seeks recovery against the employer. *Greenberg v. Life Ins. Co. of Virginia,* 177 F.3d 507, 517 (6th Cir. 1999) (citing *Strock v. Pressnell*, 527 N.E.2d 1235, 1244 (Ohio 1988)). However, Colston has failed to establish that any employee of the Library is, in fact, liable for a tort against her; she offers only a *claim* that Abrams is liable. In order to prevail on a negligent hiring claim, Colston must prove tort liability. *Greenberg*, 177 F.3d at 517 (citation omitted).

**E.     Retaliation**

Colston also claims that the Library and Abrams retaliated against her for complaining about her perceived harassment and hostile work environment. In order to establish a prima facie claim of retaliation under Title VII or R.C. 4112.20(I), Colston must prove: (1) she engaged in activity protected by the statute; (2) the Defendants knew of her protected conduct; (3) the Defendant thereafter took an adverse employment action against her; and (4) that a causal connection exists between the protected activity and the adverse employment action. Colston claims retaliation as to a number of employment actions, but for the reasons set forth below, all of these claims fail because

11

Colston fails to establish a causal connection between each action and her complaints to the library. *Allen v. Mich. Dep't of Corrs.*, 165 F.3d 405, 413 (6th Cir. 1999) ("[T]o show a causal connection, a plaintiff must produce sufficient evidence from which an inference can be drawn that the adverse action would not have been taken had the plaintiff not filed a discrimination action.").

First, Colston argues that the Library retaliated against her with disciplinary sanctions. At her deposition, Colston identified two times the Library put her on disciplinary suspension. The Library suspended Colston in September 2009 for threatening a supervisor and for unsatisfactory quality and quantity of work pursuant to the Library's human resources manual. The Library also suspended Colston in November 2009, for receiving and failing to turn over an attorney-client privileged communication from the Library's outside counsel to Tufts. However, Colston does not point to any specific evidence in the record of a causal connection between Colston's suspensions and her reports of retaliation, nor does she even attempt to offer facts to counter the Library's stated reasons for disciplinary actions.

Second, Colston argues that the Library retaliated against her by declining to promote her. Failure to promote is not generally considered an adverse employment action. *Ford v. Gen. Motors Corp.*, 305 F.3d 545, 553 (6th Cir. 2002) ("Not everything in the workplace that makes an employee upset or resentful is necessarily 'adverse' . . . An 'adverse employment action' is defined as a 'materially adverse change in the terms and conditions of [the plaintiff's] employment.'"). It is undisputed that a male officer named Normal Fadil, who had not complained about harassment, gender discrimination or hostile work environment, also unsuccessfully applied for the same position.

12

Third, Colston claims that the Library retaliated against her by temporarily laying her off. However, there is no evidence of a causal connection between the investigation and her layoff. As the district court pointed out, Colston was not laid off shortly after the complaint—she was laid off seven months afterwards. Furthermore, Colston's own deposition testimony corroborates the Library's assertions that it had legitimate reasons for the layoffs—most notably budgetary restraints and then the seniority provisions of the CBA, by which the Library was bound. The Library laid off the two officers with the least seniority, Colston and Smith, at the same time. Smith is a male officer who has not made any claims of harassment, gender discrimination, or hostile work environment.

Lastly, Colston argues that the Library retaliated by denying her request for time off on St. Patrick's Day. Her argument fails for several reasons. First, denial of time off does not constitute an "adverse employment action" because it did not materially change the terms and conditions of her employment. *Perez v. Theller*, No. S-10-053, 2011 Ohio 2176, at ¶ 14 (Ohio App. Ct. 2011). Second, Colston does not dispute the Library's reasoning that St. Patrick's Day is the busiest day of the year for the Library's security department because a parade route runs directly in front of the Library's main building. Lastly, Colston does not dispute that the Library denied other officers' requests for time off when the Library felt it was unable to provide adequate security.

## F.     Intentional Infliction of Emotional Distress

To prevail on an intentional infliction of emotional distress ("IIED") claim, Colston must prove that the Library or Abrams: (1) intended to cause her serious emotional distress; (2) the conduct was extreme and outrageous; and (3) the conduct was the proximate cause of Colston's distress. *Long v. Ford Motor Co.*, 193 F. App'x 497, 502-503 (6th Cir. 2006). The alleged conduct must be "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds

13

of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Id.* at 503.

As a matter of law, Colston's IIED claim fails with respect to all Defendants. First, Colston fails to establish outrageous conduct. Ohio courts have found far more egregious statements than those made by Abrams to fall below the "outrageous" threshold. *See, e.g.*, *Curry v. Village of Blanchester*, 2010 Ohio 3368, ¶¶ 54-55 (Ohio Ct. App. 2010) (where the supervisor told the plaintiff, in front of her colleagues, that she was "all tits and no brain"); *Lombardo v. Mahoney*, 2009 Ohio 5826, ¶ ¶10-11 (Ohio Ct. App. 2009) (where the supervisor called the plaintiff a "cock sucking mother fucker").

Colston has also failed to produce any evidence of serious emotional distress. She testified that she was able to perform her job effectively. *See Santino v. Columbus Public Schs.*, No. 2:10-cv-184, 2010 U.S. Dist. LEXIS 143276, at *52 (S.D. Ohio June 24, 2011) (granting summary judgment on IIED claim where there was "no evidence that [the] stress was severe or debilitating, or that it interfered with [plaintiff's] employment or other activities"). Furthermore, Colston offers no medical records or affidavits showing that she suffered emotional injury. Ohio IIED claims rely on testimony from a physician, psychologist, or psychiatrist. *See, e.g.*, *Schultz v. Barberton Glass Co.*, 4 Ohio St. 3d 131, 135 (Ohio 1983) (holding that, in order to "weed out dishonest claims . . . expert medical testimony will help establish the validity of the claim of serious emotional distress").

## G.     Fifth and Fourteenth Amendment Claims

Colston failed to address her fifth and fourteenth amendment claims in her responsive briefing to summary judgment in the district court, as well as her brief before this court. Therefore, we deem those claims waived.

**CONCLUSION**

For the foregoing reasons, the district court's order is AFFIRMED.