*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

ELECTRONIC CITATION: 2004 FED App. 0218P (6th Cir.)
File Name: 04a0218p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

JAYNE KNOX,
　　　　*Plaintiff-Appellant,*

　　*v.*

NEATON AUTO PRODUCTS
MANUFACTURING, INC.,
　　　　*Defendant-Appellee.*

No. 03-3075

Appeal from the United States District Court
for the Southern District of Ohio at Dayton.
No. 00-00345—Thomas M. Rose, District Judge.

Argued: April 28, 2004

Decided and Filed: July 9, 2004

Before: GUY and GILMAN, Circuit Judges; BARZILAY,*
Judge.

_____

* The Honorable Judith M. Barzilay, Judge, United States Court of
International Trade, sitting by designation.

_____

## COUNSEL

**ARGUED:** F. Harrison Green, Cincinnati, Ohio, for
Appellant. Robert A. Harris, VORYS, SATER, SEYMOUR
& PEASE, Columbus, Ohio, for Appellee. **ON BRIEF:** F.
Harrison Green, Cincinnati, Ohio, for Appellant. Robert A.
Harris, Michael F. O'Brien, VORYS, SATER, SEYMOUR
& PEASE, Columbus, Ohio, for Appellee.

_____

## OPINION

_____

JUDITH M. BARZILAY, Judge. Plaintiff-Appellant Jayne
Knox appeals from a judgment of the district court granting
summary judgment to Defendant-Appellee Neaton Auto
Products Manufacturing Inc., on her gender discrimination,
sexual harassment, wrongful discharge, and defamation
claims. For the reasons set forth below, we affirm the grant
of summary judgment on all claims.

## I. BACKGROUND

Knox went to work for Neaton Auto Products
Manufacturing, Inc. in July 1985 as a material handler. This
position carried various responsibilities, including operating
a forklift to bring and remove large containers known as
"ropacs" to and from different production lines. During her
first three and one-half years, Knox worked under a
supervisor named Tony Matlock in the shipping department.
Knox and Matlock did not get along well, and Matlock often
delegated difficult tasks to Knox, asking her to do things he
knew she could not. She also alleges that he repeatedly stated
that he did not want women working for him. Knox
eventually asked to be transferred to a different shift, and was
thereafter moved to a different material handling position.

After she transferred from under his supervision, Matlock told Knox that "if [she] ever went to work for him again, [she'd] be gone." J.A. at 515 (Knox Dep.).

During the next ten years Knox did not work directly under Matlock. He did, however, "write her up" for an incident where she replaced a fallen fire extinguisher but failed to report that it had been down, as per company policy. In 1999, Matlock was put in charge of the material handlers, assuming authority over Knox's supervisors and therefore once again over Knox. Shortly thereafter, Knox was named group leader for material handlers on the second shift – a pseudo-supervisory position that involved some direction of other employees in the absence of a supervisor.

On August 3, 1999, Knox was involved in a verbal exchange with a Neaton supervisor, Henry Wright. Knox went to see Wright to obtain keys to a locked area in order to retrieve a hose for some maintenance workers. After she was repeatedly told by Wright that she would not be able to obtain the hose, she told Wright to "forget it," and that she "was trying to do the Christian thing." J.A. at 521-522 (Knox Dep.). Knox immediately reported the incident to Neaton's Human Resources Department, verbally stating that something needed to be done "before everything blew up." Wright also reported the incident in two separate memoranda submitted to Human Resources. In the first memorandum, dated August 3, 1999, Wright stated that Knox made the comments: "You are not my supervisor;" "You don't give out my work assignments;" and "It's none of your business why I need a hose." J.A. at 699 (Pl.'s Ex. A). In the second memorandum, dated three days later, Wright stated that Knox said something to the effect of "That is not the way a Christian should act. And you are becoming more of a devil's advocate every day." J.A. at 700 (Pl.'s Ex. B). Knox also indicates that she was told by a fellow employee that another employee, a shipping associate, had overheard Matlock telling Wright that he had to do something about the hose incident, and that he (Matlock) wasn't going to let it drop. Carol

Necessary, a member of Neaton's Human Resources Department, investigated the incident. As a result of this incident, a meeting was called between Knox, her supervisor Ken Messer, Messer's supervisor Matlock, and Necessary. At this meeting Knox was informed that her behavior toward Wright was deemed insubordinate and that she was being suspended for three days without pay, removed from her position as group leader, and placed on probation for six months. Regarding this probationary period, Knox was notified in writing that "[d]uring this time any violation of a Neaton rule or policy will result in immediate termination." J.A. at 115 (Def.'s Ex. D). Kevin Freck, another Neaton employee, replaced Knox as group leader of the second shift and she was eventually transferred to the first shift.

Before she was transferred to the first shift, on September 16, 1999, Knox was involved in an incident that violated her probation and led directly to her termination. As part of her responsibilities, Knox was in charge of removing full ropac containers from the production line, where they were being filled with finished product, and bringing empty ones back to the line. Supplying the production lines with empty ropacs is a primary objective of the material handler position because when a production line is not provided with empty ropacs, it is forced to shut down. A few hours into her shift, Knox noticed that the line employees were filling up their last empty ropac, but despite this observation, Knox drove by on her forklift three times without delivering any empty ropacs. Knox claims that the ropac being filled could not be removed because it had not yet been quality inspected. Then, rather than delivering empty ropacs herself, she told another material handler of the situation and requested that this other handler deliver empty ropacs to the line. Neaton investigated the incident after the fact and determined that because of Knox's failure to deliver empty ropacs, the production line had shut down. On September 23, 1999, Knox was called to a meeting with the management team for her position, which included David Dunfee, Ken Messer, Tony Matlock, and Carol Necessary. At the meeting, Knox

was informed that she was being discharged because of her unsatisfactory performance on September 16 – a violation of the conditions of her probation. Knox was then replaced by Teresa Pressel, a female Neaton employee. J.A. at 527.

Knox also claims that while she was employed by Neaton a number of male employees were treated more leniently than she was. She describes several situations where male employees used abusive language and refused instructions from their supervisors but were never disciplined. Furthermore, Knox claims that male probationary employees were also treated more leniently. Specifically, she alleges in an Equal Employment Opportunity Commission questionnaire that "[n]ear September 30, 1999, Mike O'Connor of the Die Cast Department was on a six month disciplinary probation . . . when he got into a fight with another employee . . . and only received five days suspension." J.A. at 135-136. She also alleges that "[o]n October 5, 1999, Bart Lanhart, Rim Room employee, was on a six month disciplinary probation . . . He broke company policy rule [sic] of leaving company property during working hours without checking out   . . . He was not fired for this incident . . ." J.A. at 135-136. These claims are not elaborated upon or substantiated anywhere in the record of this case.

Finally, Knox claims that while she was employed by Neaton, another employee named Greg Schaffer made a number of sexually oriented remarks in her presence. On many occasions, Schaffer would comment about female Neaton employees, "[w]hat he would like to do to them and their chests, their build, making them sweat." J.A. at 70-72, 575 (Knox Dep.). Schaffer would also comment on "[h]ow he likes to watch them walk away from him as well as towards him." Id. Furthermore, Knox claims that Schaffer and other Neaton employees she worked with often used the "f-word" and took the Lord's name in vain. J.A. at 69-71. Knox does not allege that these comments were directed at her, and she also admits they were often made in a group

setting. Knox asked Schaffer to stop and complained of this behavior to her superiors, but it never ceased.

## II.  ANALYSIS

### A.  Standard of Review

A grant of summary judgment is reviewed de novo. *Therma-Scan, Inc. v. Thermoscan, Inc.,* 295 F.3d 623, 629 (6th Cir. 2002). Summary judgment is proper where there exists no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(c). In considering a motion for summary judgment, the district court must construe the evidence and draw all reasonable inferences in favor of the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 89 L. Ed. 2d 538, 106 S. Ct. 1348 (1986). The central issue is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 251-52, 91 L. Ed. 2d 202, 106 S. Ct. 2505 (1986).

### B.  Gender discrimination under Title VII and Ohio state law

In order to establish a prima facie case of gender discrimination under Title VII, Knox must show that (1) she was a member of a protected class; (2) she suffered an adverse employment action; (3) she was qualified for the position; and (4) she was treated differently from similarly situated members of the unprotected class. *See McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802, 36 L. Ed. 2d 668, 93 S. Ct. 1817 (1973); *Hoskins v. Oakland County Sheriff's Dept.*, 227 F.3d 719, 731 (6th Cir. 2000) (citing *Warfield v. Lebanon Correctional Inst.*, 181 F.3d 723, 728-29 (6th Cir. 1999)). Because the prima facie case requirements are essentially the same under the Ohio Revised Code § 4112.02, *see Ohio Civil Rights Comm'n v. David Richard Ingram,*

*D.C., Inc.*, 69 Ohio St. 3d 89, 630 N.E.2d 669, 672 (Ohio 1994), Knox's federal and state-law claims of gender discrimination may be disposed of together.

The district court properly determined that Knox failed to establish a prima facie case for several reasons. First, it correctly determined that because Matlock's statements about not wanting women working for him and about Knox "being gone" if she were ever to work for him again were made ten years prior to Knox's termination, they were not sufficiently close in time to the allegedly discriminatory action. Second, neither the incidents where Matlock made Knox perform tasks that she couldn't handle, nor where Matlock wrote her up for failing to report a fallen fire extinguisher, have been linked in any way to sex-based discrimination – as opposed to sex-neutral animus between Knox and Matlock. Third, Knox's allegation that one Neaton employee told yet another that the employee had overheard, in the break room, Matlock telling Wright that he had to do something about the hose incident, and that he wasn't going to let it drop, constitutes inadmissible hearsay within hearsay and cannot be used to support Knox's claim that Matlock's statement had not become stale. *See* FED. R. CIV. P. 56(e); *Moore v. Holbrook*, 2 F.3d 697, 699 (6th Cir. 1993) (A court cannot rely on unsworn inadmissible hearsay when ruling on a summary judgment motion).

Finally, we turn to the district court's analysis of the fourth prong of the *McDonnell Douglas* burden-shifting analysis, which requires a plaintiff to demonstrate either that she was replaced by someone outside the protected class or that she was treated differently from similarly situated members of the unprotected class. *See Hoskins v. Oakland County Sheriff's Dept.*, 227 F.3d 719, 731 (6th Cir. 2000). The district court held that although Knox was replaced as team leader by Kevin Freck after being demoted, suspended, and placed on probation, Knox had not asserted that being stripped of the "pseudo-supervisory" designation as group leader was a demotion in any meaningful sense. Knox claims on appeal

that the position involves some direction of other employees in the absence of a supervisor and is a special designation. Even if this did qualify as a meaningful demotion, however, Knox is unable to establish that the decision to remove her from the group leader position was mere pretext for some other discriminatory motive. Neaton clearly informed Knox that she was being stripped of her position as group leader because she violated the Neaton Associate Standards of Conduct.[1] Knox responds that genuine issues of material fact exist as to whether this reason was pretextual because the decision to place her on probation was made in part by Matlock. She argues that his comments and hostile behavior towards her, taken together, constitute a circumstantial case of discrimination.[2] As stated above, however, these incidents do not constitute circumstantial evidence of sex-based discrimination, as opposed to sex-neutral animosity between her and Matlock. Furthermore, Knox's allegation that Wright was unduly influenced by Matlock is based entirely on statements overheard by one Neaton employee and transmitted to Knox by yet another individual, which constitutes inadmissible hearsay, as also discussed above. Thus, Knox is unable to establish that Neaton's decision to remove her from the group leader position was a mere pretext for an alternative discriminatory rationale.

---

[1] Knox was informed that: "On August 4, 1999 an incident occurred where you used abusive language with another Neaton Associate. . . . During this incident you also refused to cooperate with a legitimate request from a [Neaton] supervisor. . . . This is a violation of Neaton Associate Standards of Conduct . . . You are removed from your group leader's position as a result of this violation." J.A. at 116 (Def.'s Ex. D).

[2] In support of the proposition that temporally remote comments can be used to build a circumstantial case of discrimination, Knox cites to *Robinson v. Runyon*, 149 F.3d 507, 514 (6th Cir. 1998) and *Abrams v. Lightolier, Inc.*, 50 F.3d 1204, 1214 (3d Cir. 1995). In both cases the court held that various discriminatory statements and events, taken together, could suffice to build a case of discrimination. In the present case, however, Knox is unable to produce any other circumstantial evidence of sexually discriminatory treatment.

The district court also correctly held that Knox failed to establish that she was treated differently than similarly situated non-protected employees. Relying on this court's decision in *Hollins v. Atlantic Co.*, 188 F.3d 652 (6th Cir. 1999), the district court held that Knox must establish that "a male employee, who was on probation, was not discharged for action or inaction that Neaton had determined shut down a production line." [Although it ultimately reached the correct result,] [we] believe the district court misconstrued this circuit's precedent in applying an exceedingly narrow reading of the *Hollins* decision. In employment discrimination cases, the plaintiff need not demonstrate an exact correlation with the employee receiving more favorable treatment in order for the two to be considered "similarly situated;" rather, this court has held that the plaintiff and the employee with whom the plaintiff seeks to compare himself or herself must be similar in "all of the *relevant* aspects." *Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 353 (6th Cir. 1998) (citing *Pierce v. Commonwealth Life Ins. Co.*, 40 F.3d 796 (6th Cir. 1994)) (emphasis in original). This amounts to a harmless error, however, because Knox has failed to provide any admissible evidence that similarly situated males were treated differently than she was. To establish her prima facie case, Knox points exclusively to statements she made in response to an Equal Opportunity Employment Commission questionnaire. Nowhere in the record are these or other statements substantiated or is testimony regarding these incidents developed. Knox does not indicate that she has any personal knowledge of these events, nor does she indicate how or where she obtained this information. Furthermore, Knox does not present any evidence regarding the terms of probation that these male employees were allegedly under. In fact, at oral argument Knox's counsel admitted a failure to gather the necessary information to support this claim. Without such information, it is impossible to determine whether Knox can make a prima facie showing that she was treated less favorably than similarly situated males. Knox has therefore failed to meet her burden of production under Rule 56(e) of the Federal

Rules of Civil Procedure. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324, 91 L. Ed. 2d 265, 106 S. Ct. 2548 (1986) (Rule 56(e) requires the nonmoving party to go beyond the pleadings and by her own affidavits, or by the "depositions, answers to interrogatories, and admissions on file," designate "specific facts showing that there is a genuine issue for trial"). Thus, the district court correctly held that because Knox failed to establish a prima facie case of discrimination, Neaton was entitled to summary judgment on the Title VII and R.C. § 4112.02 claims.

## C.  Sexual Harassment

In order to establish a prima facie case of hostile environment sexual harassment under R.C. § 4112, Knox must establish that: (1) the harassment was unwelcome; (2) the harassment was based on sex; (3) the harassing conduct was sufficiently severe or pervasive to affect the terms, conditions, or privileges of employment, or any matter directly or indirectly related to employment; and (4) the harassment was committed by a supervisor or the employer, through its agents or supervisory personnel, who knew or should have known of the harassment and failed to take immediate and appropriate corrective action. *Hampel v. Food Ingredients Specialties, Inc.*, 89 Ohio St. 3d 169, 176-77, 729 N.E.2d 726 (Ohio 2000). Conduct that is merely offensive, however, is not actionable. *See Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 126 L. Ed. 2d 295, 114 S. Ct. 367 (1993); *Hampel*, 89 Ohio St. 3d at 180. Rather, the conduct complained of must be severe or pervasive enough to create an environment that not only the victim subjectively regards as abusive but also a reasonable person would find hostile or abusive. *Harris*, 510 U.S. at 21-22. To be actionable, harassment must constitute more than words that have sexual content or connotations. *See Onacle v. Sundowner Offshore Serv., Inc.*, 523 U.S. 75, 80, 140 L. Ed. 2d 201, 118 S. Ct. 998 (1998). Finally, members of one sex must be exposed to disadvantageous terms or conditions of employment to which members of the other sex are not exposed. *Id.*

The District Court granted summary judgment on Knox's hostile environment sexual harassment claim on the grounds that she had failed to make out the third element of the *Hampel* test; namely, that the alleged conduct was sufficiently severe or pervasive to affect the terms, conditions, or privileges of employment, or any matter directly or indirectly related to employment. 89 Ohio St. 3d at 176-77. Knox alleges in her deposition that she heard co-workers use "the f-word," that they "took the Lord's name in vain," and that one co-worker, Greg Schaffer, continuously made sex-related comments, such as commenting on different "women's good looking behind[s]," and talked about "sleeping with different women and comments about what [they] would be like." Knox states that she repeatedly asked Schaffer to stop and reported his behavior, but it never ceased. She admits, however, that these comments were usually made during shift meetings and were directed to the group, rather than to her personally. *Cf. Black v. Zaring Homes, Inc.*, 104 F.3d 822 (6th Cir. 1997), *cert. denied*, 522 U.S. 865, 139 L. Ed. 2d 114, 118 S. Ct. 172 (1997) (noting that in that case, most of the comments were not directed at plaintiff, a fact which contributed to the conclusion that the conduct was not severe enough to create an objectively hostile environment) (citation omitted). She also admits that she was never touched or physically harassed. *Cf. Harris*, 510 U.S. at 17-23 (listing a non-exhaustive set of factors to consider in evaluating whether harassment is severe or pervasive enough to be actionable, including severity of the conduct complained of and whether it is physically threatening or humiliating). Finally, Knox admitted that the comments "[d]idn't get in [her] way of actually doing [her] job . . ." *Id.* (listing as a factor whether conduct unreasonably interferes with an employee's performance). Thus, because the evidence is insufficient to support a finding that the various comments and behavior complained of by Knox, although crass and offensive, were severe or pervasive enough to create an objectively hostile work environment, the district court correctly denied Knox's sexual harassment claim.

### D.    Wrongful Discharge in Violation of Public Policy

In order to establish a claim under Ohio law for wrongful discharge in violation of public policy, a plaintiff must prove the following four elements: (1) a clear public policy manifested in a statute, regulation or the common law; (2) that discharging an employee under circumstances like those involved would jeopardize the policy; (3) that the discharge at issue was motivated by conduct related to the policy; and (4) that there was no overriding business justification for the discharge. *Kulch v. Structural Fibers, Inc.*, 78 Ohio St. 3d 134, 151, 677 N.E.2d 308 (Ohio 1997); *see also Collins v. Rizkana*, 73 Ohio St. 3d 65, 69-70, 652 N.E.2d 653 (Ohio 1995). The District Court reasoned that the third and fourth elements amount to "a legitimate, non-discriminatory reason analysis for the statutory claim under [R.C. § 4112]." Because it granted summary judgment on Knox's sex discrimination claim, the District Court held that summary judgment on the wrongful discharge claim was proper too.

In her complaint, Knox argues that she was "wrongfully discharged . . . in violation of her rights as set forth under the Neaton Auto Product Manufacturing Handbook and under common law." She does not identify any other source of "clear public policy" to sustain her wrongful discharge claim. In similar cases, R.C. § 4112 has been recognized as a source of public policy sufficient to satisfy the first prong of the *Kulch* test. However, because Knox cannot survive summary judgment on her section 4112/Title VII claim, and because Knox has not identified any other clear public policy that would be jeopardized by her termination, summary judgment is proper on this claim as well. *See Cochran v. Columbia Gas of Ohio, Inc.*, 138 Ohio App. 3d 888, 895, 742 N.E.2d 734 (Ohio Ct. App. 2000) (affirming a grant of summary judgment against appellant, where the court had determined that appellant failed to establish grounds for relief under R.C. § 4112.02 and did not identify any other source of "clear public policy" to sustain a wrongful discharge claim).

Therefore, the district court correctly granted summary judgment on the wrongful discharge claim.

## E.  Defamation

Defamation is a "false publication that injures a person's reputation, exposes him to public hatred, contempt, ridicule, shame or disgrace, or affects him adversely in his trade or business." *Sweitzer v. Outlet Communs., Inc.*, 133 Ohio App. 3d 102, 108, 726 N.E.2d 1084 (Ohio Ct. App. 1999). Furthermore, Ohio law provides for a defense of qualified privilege to allegations of defamation where the publisher and the recipient have a common interest, and the communication is of a kind reasonably calculated to protect or further it. *See Hahn v. Kotten*, 43 Ohio St. 2d 237, 243, 331 N.E.2d 713 (Ohio 1975). For example, a communication made in good faith on a matter of common interest between an employer and an employee, or between two employees concerning a third employee, is protected by qualified privilege. *See Evely v. Carlon Co., Div. of Indian Head, Inc.*, 4 Ohio St. 3d 163, 165, 166, 447 N.E.2d 1290 (Ohio 1983). Once a defendant demonstrates the existence of qualified privilege, the plaintiff can only prevail upon a showing of actual malice. *Id.* at 1293.

Knox claimed before the district court that Neaton committed defamation when Henry Wright filed his more detailed report of the September 16, 1999 hose incident, attributing to Knox the statements: "that's not the way a Christian should act" and "you are becoming more of a devil's advocate every day." She argues that the district court erroneously held that Wright's report containing these statements was protected by qualified privilege. She also argues that the district court erred in holding that Wright's report was not defamatory. Because Wright's report was made in the regular course of business regarding matters of common interest between himself, as Knox's superior, and the Human Resources Department at Neaton concerning Knox's behavior on the job, the district court correctly held that these statements were protected by qualified privilege.

In order to establish actual malice, Knox further claims that circumstantial evidence exists that Matlock pressured Wright into drafting the second report which stated that Knox had used abusive language. This circumstantial evidence cited by Knox is limited to (1) the fact that in Wright's first report there was no mention of abusive language, and (2) statements by a Neaton employee who heard that another co-worker overheard Matlock telling Wright that he should not let the issue drop. As stated above, the district court correctly concluded that these alleged statements, overheard by a co-worker's co-worker, constitute hearsay within hearsay and would not be admissible in court to persuade a jury that Wright acted with actual malice. The fact that there existed some discrepancy between the two reports, as well as between what Knox claims to have stated and what Wright attributed to her in his second report do not, alone, reach the level of actual malice. Therefore, the district court correctly granted summary judgment on Knox's defamation claim.

## III.  CONCLUSION

For all of the reasons set forth above, we **AFFIRM** the judgment of the district court.