### Deanne McBRIAN, Plaintiff,

v.

### RIETH–RILEY CONSTRUCTION COMPANY INCORPORATED, Defendant.

### Case No. 1:11–CV–104.

United States District Court, W.D. Michigan, Southern Division.

March 23, 2012.

Adam Howard Eichner, Dawid & Gatti PLLC, Ann Arbor, MI, for Plaintiff.

Andrea J. Bernard, Gregory Matthew Kilby, Warner Norcross & Judd LLP, Thomas C. Johnson, MI Dept. Attorney General, Grand Rapids, MI, for Defendant.

### OPINION AND ORDER

ROBERT J. JONKER, District Judge.

This is an employment discrimination case arising out of Defendant Rieth–Riley Construction Company Incorporated's ("Rieth–Riley") decision not to re-hire Plaintiff Deanne McBrian for the 2008 road construction season. Rieth–Riley moves for summary judgment (docket # 19). The Court heard oral argument on

the motion on February 29, 2012. At that time, the Court took the motion under advisement and gave the parties the opportunity to file supplemental briefing (docket #28). The Court has thoroughly reviewed the record, including, without limitation, the Defendant's supplemental briefing (docket #30), and carefully considered the applicable law. The motion is ready for decision.

### Factual and Procedural Background

Rieth–Riley is a construction company that builds and operates roads in Michigan. (Def.'s Br. in Support of Mot. for Summ. J., docket #20, at 1.) Rieth–Riley operates in eight operational areas in Michigan, including Traverse City. (Schaub decl., docket #20–1, at ¶5.) As a condition of participating in state road construction projects in Michigan, Rieth–Riley participates in Michigan's On–the–Job Training Program (the "OJT Program"). (Id. at ¶10.) Under the OJT Program, Rieth–Riley is required to hire and train a certain number of women and individuals from minority groups each year. (Id.) The workers who participate in the OJT Program obtain both classroom training and on-the-job experience. (Id.) They graduate from the program after meeting particular training goals and performing a specified number of on-the-job working hours. Id. In 2007, the Michigan Department of Transportation assigned Rieth–Riley nine OJT Program participants, and in 2008, increased the number to ten. (Id. at ¶11.) In each of 2007 and 2008, Rieth–Riley placed two OJT Program participants in the Traverse City area, and assigned the other participants elsewhere in the state. (Id.)

Ms. McBrian joined the OJT Program in 2004. (Pl.'s Br. in Resp. to Def.'s Mot. for Summ. J., docket #22, at 4–5.) Ms. McBrian worked as an OJT Laborer for Rieth–Riley through the OJT Program from 2004 through 2007. (Id. at 5.) Rieth

Riley has concrete and asphalt crews. (Sours dep., docket #20–5, at 30.) Ms. McBrian worked primarily as a laborer on the Traverse City Area asphalt crew. (Schaub decl. at ¶12.) In addition, "[a]s a Laborer, Ms. McBrian had to perform a large and varied number of duties across several different construction disciplines." (Id. at ¶13.) According to her supervisor, Ms. McBrian worked for a variety of types of crews, including the concrete crew. (Sours dep., docket #20–5, at 30.)

From 2004–2007, Ms. McBrian completed a series of classroom certification programs concerning all aspects of preparing, evaluating, and completing work on road construction sites. (Pl.'s Br. in Resp. to Def.'s Mot. for Summ. J., docket #22, at 5.) She also "logged thousands of hours on Rieth–Riley's road crew, acting as a general laborer on the asphalt crew, as well as some work on their cement crew." (Id.) Ms. McBrian "never rejected any work, even if asked to drive multiple hours to work on Defendant's projects being completed by other crews outside the Traverse City area." (Id.) Throughout her employment at Rieth–Riley, Ms. McBrian received generally favorable performance reviews, and her reviews improved over time. (see docket #24–2.) Her 2007 performance evaluation reflects "meets job requirements" in every category, the highest marks available on the form. (Id. at 1.) That evaluation also includes a comment from her supervisor that Ms. McBrian "does a good job with a very good attitude." (Id. at 1–2.) Ms. McBrian completed the OJT Program requirements and achieved her goal of becoming a journeyman laborer during the summer of 2007. (Pl.'s Br. in Resp. to Def.'s Mot. for Summ. J., docket #22, at 5.)

Rieth–Riley does little road construction in Michigan during the winter months, and it lays off most of its Michigan workforce every winter. (Schaub decl. at ¶¶6–7.)

Each spring, Rieth–Riley invites employees laid off in the prior season to a policy and procedure refresher training meeting. (*Id.* at ¶ 8.) If Rieth–Riley needs any of those employees to return to work, Rieth–Riley calls and re-hires them on an as-needed basis. (*Id.* at ¶ 9.) On March 7, 2007 Rieth–Riley issued a letter, on company letterhead, inviting employees to the 2007 spring meeting (docket # 24–3.) The letter indicates that the spring meeting will take place in Traverse City in the same location as the year before. (*Id.*) The letterhead includes the phrase "Traverse City Area;" the memorandum is addressed to "All Employees." (*Id.*) It is not entirely clear whether the "All Employees" refers only to Rieth–Riley's Traverse City Area employees or to a wider swath of Rieth–Riley employees. (*Id.*)

Ms. McBrian notified Rieth–Riley of her availability to work the 2008 construction season, but Rieth–Riley did not re-hire her. (Pl.'s Br. in Resp. to Mot. for Summ. J., docket # 23, at 5–6.) Rieth–Riley explains that it observed "a major downturn in the number of road construction projects put out for bid by the State of Michigan in 2008." (Schaub decl. at ¶ 11.) Because of the economy and the decreased number of bids Rieth–Riley won, Rieth–Riley's hiring needs in the Traverse City area "were significantly less in the 2008 construction season than they had been in prior years." (*Id.* at ¶ 16.) Rieth–Riley points out that it did not hire any new laborers for the asphalt crews during the 2008 construction season. (*Id.*) Rieth–Riley states that its decision not to re-hire Ms. McBrian for the 2008 season was based on "her relative lack of experience, her lower performance, and the company's decreased staffing needs for the 2008 season." (*Id.* at ¶ 25). Rieth–Riley notes

that "Ms. McBrian was the least experienced journeyman Laborer on the Rieth–Riley payroll at the end of the 2007 construction season." (*Id.* at ¶ 26.) Though broadly worded, this statement actually refers not to the entire Rieth–Riley payroll, or to all Rieth–Riley employees based in Michigan, but rather to the Rieth–Riley employees based in Traverse City. (*Id.* at Exh. B.)

Even though Rieth–Riley did not re-hire Ms. McBrian for the 2008 road construction season, she asserts the company did hire similarly-situated males for positions she was qualified to fill. She identifies these men as Michael Turner, David Campbell, James Anderson, Darren Everest, Frederick Looze, Jason Redman, Darick Gonzalez, Jorge Vazquez, Ed Smyk, Rhyan Glezman, Chris Kelly, Jeff Hill, and Pete Prater. Rieth–Riley contends that none of these individuals offers an appropriate comparison, because they (1) did not work on a Traverse City Crew (Messrs. Turner and Campbell) (Bell decl., docket # 25–2, at ¶ 4); (2) worked primarily on concrete, not asphalt, crews (Messrs. Anderson, Everest, and Looze) (Schaub decl. at ¶ 5); (3) were the OJT Program participants, not journeyman laborers (Messrs. Gonzalez and Vazquez) (*Id.* at ¶ 15); (4) were not rehired for the 2008 season (Messrs Glezman and Hill); (5) had more extensive and varied experience than Ms. McBrian (Messrs. Smyk, Kelly, and Prater) (*Id.*); or (6) were not seasonal hires (Mr. Redman) (Schaub decl. at ¶ 20).

The parties focus much of their argument on Jason Redman. Mr. Redman first applied for employment as a laborer with Rieth–Riley on April 17, 2006. (Redman application, Pl. Ex. 7.) His application reflects that he had worked in irrigation each summer from 1999 until 2005;[1] each

---

[1.] His application says that he worked in irrigation the summers from 1999–2006. Since the application pre-dates the summer of 2006, it appears he worked summers through 2005 but not 2006.

winter from 2001 through 2005, plus the full year in 2004, as a motorcycle technician and repairperson; and one month as a press operator. (*Id.*) The application indicates that during the course of his employment he acquired six months of experience in masonry, five years of experience driving a pick-up truck, and two years of experience operating a one ton truck, a stake bed/flat bed truck, and high/low fork truck. (*Id.*) His application reflects no experience in surfacing pavement of any sort. Rieth–Riley's own spreadsheet detailing the years of experience of the laborers based in Traverse City describes Mr. Redman as having ten years of experience. (Schaub decl., Ex. 5.) It is difficult to ascertain from the record how Rieth–Riley reached this number; the employment application does not support it. Rieth–Riley does not address this issue. Rieth–Riley simply emphasizes that it did not lay off Mr. Redman after the summer of 2007, but instead employed Mr. Redman as a mechanic throughout the winter months. (*Id.* at ¶ 20.)

Ms. McBrian filed a charge of sex discrimination with the Equal Employment Opportunity Commission ("EEOC") based on Rieth–Riley's decision not to re-hire her. (First Am. Compl., docket # 5–1, Ex. 1, EEOC letter.) The EEOC determined that there existed reasonable cause to believe that Rieth–Riley violated Title VII in failing to re-hire Ms. McBrian and proposed that the parties negotiate a conciliation agreement. (*Id.*) The parties did not reach an agreement. Ms. McBrian filed this lawsuit on January 28, 2011, alleging that Rieth–Riley violated Title VII and the Elliot Larsen Civil Rights Act ("ELCA") by discriminating against her on the basis of gender in its decision not to re-hire her.

## Legal Standard

Summary judgment is appropriate only if, "taking the evidence in the light most favorable to the non-moving party, 'the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law.'" *La Quinta Corp. v. Heartland Props., LLC,* 603 F.3d 327, 335 (6th Cir.2010) (quoting FED.R.CIV.P. 56(2)). In considering a motion for summary judgment, the Court draws all justifiable inferences in favor of the non-moving party. *Bobo v. United Parcel Service Inc.,* 665 F.3d 741, 748 (6th Cir.2012). On a summary judgment motion, "the ultimate question ... is whether the evidence presents a sufficient factual disagreement to require submission of a particular legal claim to the jury or whether the evidence on the claim is so one-sided that [the moving party] should prevail as a matter of law." *Id.* at 748–49.

Both Title VII and the ELCA prohibit employers from discriminating against in individual with respect to employment on the basis of sex. 42 U.S.C. § 2000e–2(a)(1); MICH. COMP. L. § 37.2202(1)(a). The parties agree that this is a single-motive case without any direct evidence of discrimination. *Hashem–Younes v. Danou Enterprises, Inc.,* 311 Fed.Appx. 777, 779 (6th Cir.2009). In such a case, a *McDonnell Douglas* burden-shifting approach applies under both federal and Michigan law.[2] *Risch v. Royal Oak Police Dept.,* 581 F.3d 383, 390 (6th Cir.2009);

---

**2.** Even under a mixed-motive framework, the *McDonnell Douglas* structure is useful when, as in this action, the case is entirely circumstantial. The purpose of the *McDonnell Douglas* approach is to illuminate the ultimate question in any discrimination case involving a claim of disparate treatment: namely, did the employer's adverse action result, at least in part, from a prohibited factor. *See Wright v. Murray Guard, Inc.,* 455 F.3d 702, 712–13 (6th Cir. 2006).

Hazle v. Ford Motor Co., 464 Mich. 456, 628 N.W.2d 515 (2001) (citing *Lytle v. Malady* (On Rehearing), 458 Mich. 153, 172–78, 579 N.W.2d 906 (1998)). Under this framework, the plaintiff must first establish a prima facie case. *Id.* The elements of a prima facie case of gender-based employment discrimination for failure to re-hire are (1) plaintiff is a member of a protected class; (2) plaintiff suffered an adverse employment action; (3) plaintiff was qualified for the position; (4) she was treated differently from similarly situated members of the unprotected class. *Knox v. Neaton Auto Prods. Mfg., Inc.*, 375 F.3d 451 (6th Cir.2004). If a plaintiff establishes a prima facie case, the burden of production shifts to the defendant, who must offer evidence of a legitimate, non-discriminatory reason for its action. *Risch*, 581 F.3d at 391. If the defendant meets this burden, then the burden of production shifts back to the plaintiff, who must identify evidence that the proffered reason is actually a pretext for unlawful discrimination. *Id.* A plaintiff may demonstrate pretext by showing that the employer's stated reason (1) has no basis in fact; (2) was not the actual reason; or (3) is insufficient to explain the employer's action. *Id.* The burden of persuasion remains with the plaintiff at all times. *Id.*

## Discussion

### 1. Prima Facie Case Analysis

The parties do not dispute that Ms. McBrian has satisfied the first three elements of a prima facie case. As a woman, she belongs to a protected class; she was qualified for the position of laborer; and she experienced an adverse action when Rieth–Riley did not re-hire her for the 2008 road construction season. Rieth–Riley contends that Ms. McBrian has failed to demonstrate the fourth element, that she was treated differently from similarly-situated members of a non-protected class. According to Rieth–Riley, the company hired no similarly-situated male for the 2008 construction season.

■ "Discrimination cases frequently turn on whether the plaintiff can identify one or more comparators who are similarly situated in all relevant respects." *Bobo v. United Parcel Service*, 665 F.3d 741, 753 (6th Cir.2012). There need not be an "exact correlation" for individuals to be similarly situated. *Id.* at 752 (citing *Martin v. Toledo Cardiology Consultants, Inc.*, 548 F.3d 405, 412 (6th Cir.2008)). On the contrary, a plaintiff need show "only that [s]he and he[r] proposed comparators were similar in all relevant respects." *Id.* at 751. In *Bobo*, the Sixth Circuit reversed a District Court's summary judgment because the District Court defined the range of comparable cases too narrowly. Defining the category of comparators too narrowly risks defeating the entire purpose of the burden-shifting analysis by collapsing the second and third steps of the analysis with the prima facie case itself. To avoid this error, the *Bobo* decision reminds District Courts to exercise independent judgment in determining "the relevancy of particular aspects of the plaintiff's employment status and that of the non-protected employee" *Id.* at 751 (quotations omitted), bearing in mind the "difficulty of applying the 'similarly situated' comparator standard and the danger of treating that standard as requiring exact correlation, in violation of our precedents." *Id.* at 753.

■ Here, Plaintiff has identified thirteen potential prima facie comparators. Some of them are easily excluded from the analysis. Rieth–Riley has produced unrefuted evidence that two were not actually rehired in 2008, and that another two were assigned through the OJT Program, not as journeyman applicants. But this still leaves nine cases of prima facie comparators that are not so easily excluded. All are successful male applicants for a 2008

seasonal journeyman laborer job with Rieth–Riley in Michigan—precisely the position for which Plaintiff applied and was turned down. Nothing more is required for prima facie comparators on this record. Rieth–Riley may well have had valid reasons for preferring some or all of its actual hires over Plaintiff, but the proper place to test those reasons is the second and third steps of the analysis, not the prima facie case itself.

For example, Rieth–Riley argues that several of the male journeyman laborers it hired in 2008 are not prima facie comparators because they had more experience than Ms. McBrian. Accepting that analysis at the prima facie level would require a plaintiff to identify someone with exactly the same level of experience. One month, or even one day more, would be "more experience" and in Rieth–Riley's view not comparable at the prima facie level. This is the kind of problem *Bobo* seeks to prevent at the prima facie case. The line-drawing required to determine how much experience meaningfully differentiates one journeyman laborer from another belongs to the later stages of the analysis, when the Court considers whether the company's proffered reasons for its decision not to re-hire Ms. McBrian are legitimate, non-discriminatory reasons, or pretextual.

Similarly, Rieth–Riley contends that journeyman laborers assigned to crews other than the Traverse City crew or working primarily on a particular type of pavement surface—asphalt or concrete— are not appropriate comparators. In theory, geographical assignment or type of work could justify excluding individuals from the class of prima facie comparables, but the summary judgment record does not support it in this case. The Rieth–Riley employment applications in the record do not specify office location or type of work surface. Instead, they are general applications for the position of laborer with Rieth–Riley in Michigan. Ms. McBrian's own supervisor stated in his deposition that laborers who worked primarily on asphalt surfaces, including Ms. McBrian, also worked on concrete surfaces from time-to-time. (Sours dep., docket # 20–5, at 30.) The memorandum from Rieth–Riley inviting laid-off employees to the spring 2008 meeting was addressed to "All Employees," not just Traverse City employees. Rieth–Riley acknowledges that laborers from various road crews move around to help each other. "[D]ifferences in job activities ... do not 'automatically constitute a meaningful distinction that explains the employer's differential treatment of the two employees.'" *Bobo*, 665 F.3d at 751 (quoting *Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 352 (6th Cir.1998)).

On the defendant's motion for summary judgment, drawing all reasonable inferences in favor of the plaintiff, it is not appropriate to limit prima facie comparators in the manner Rieth–Riley seeks. To do so would be to require, in essence, the kind of "exact correlation" *Bobo* and its predecessors forbid. At this stage of the analysis, the appropriate prima facie comparators are the individuals who sought work as journeyman laborers on Rieth–Riley road crews in Michigan at the beginning of the 2008 road construction season. This does not include the two OJT Program participants, Darick Gonzalez, Jorge Vazquez, who were not journeyman laborers and not similarly-situated to Ms. McBrian. Nor does it include Rhyan Glezman and Jeff Hill: Ms. McBrian has not contested Rieth–Riley's statement that these men were not hired for the 2008 road construction season. It does, however, include the other individuals Ms. McBrian identified as journeyman laborers, all male, whom Rieth–Riley hired while declining to hire her in 2008. This group comprises Michael Turner, David

Campbell, James Anderson, Darren Everest, Frederick Looze, Jason Redman, Ed Smyk, Chris Kelly, and Pete Prater. Ms. McBrian has established the fourth element of the prima facie case.

## 2. Legitimate Explanations and Pretext Analysis

Rieth–Riley presents three principal reasons for its decision not to re-hire Ms. McBrian for the 2008 road construction season. First, Rieth–Riley notes that the economic downturn, and fewer accepted bids, led to reduced staffing needs in 2008. Rieth–Riley also asserts that Ms. McBrian had less experience than the men hired in her stead. Finally, Rieth–Riley claims that Ms. McBrian was less qualified than those individuals, based on reasons other than experience, such as additional skills or better work records. Each of these reasons is valid on its face and satisfies Rieth–Riley's burden under the second step of the analysis. The next question is whether Ms. McBrian has met her burden of presenting evidence from which a reasonable juror could conclude that Rieth–Riley's stated reasons were pretext for discrimination. To satisfy this burden, she must show the reasons offered lacked a basis in fact; were not the actual reasons; or are insufficient to explain Rieth–Riley's actions. On this record, drawing all inferences in Plaintiff's favor, she has carried her burden. A jury has to resolve the case.

### a. Decrease in Work Statewide

■ No one disputes that there was less road work available to Rieth–Riley in Michigan in 2008. But this does not entirely resolve the question of whether Rieth–Riley's proffered reason of reduced staffing needs is pretextual. No one disputes that there was still at least some work, and the real question is whether the hiring decisions made as to that available work were legitimate. To the extent Rieth–Riley attempts to distinguish workload and hiring among work locations, its first problem is the lack of record evidence justifying a narrow focus on Traverse City. The summary judgment record includes no explanation for why Rieth–Riley did not or could not choose to assign Plaintiff to another operational area in the state, including geographically similar areas such as Petoskey. Moreover, even assuming the focus is properly on Traverse City alone, Rieth–Riley's suggestion that Traverse City did not need any additional laborers is called into question by exhibits reflecting that some general laborers from other areas did work on Traverse City area paving jobs during the 2008 season. (docket # 23–3 at 3; docket # 25 at 5, n. 3.) If Traverse City had no need, why assign laborers from other areas to work there for what the exhibits suggest was a significant number of hours in the 2008 season? (Id.) Rieth–Riley also chose to assign two of its OJT Program participants (both male) to the Traverse City area. The decision to place the male OJT Program participants in Traverse City, instead of some other part of the Rieth–Riley system, could also give rise to an inference of pretext on the decreased workload explanation. Drawing all reasonable inferences in Ms. McBrian's favor, there is a genuine issue as to whether the claimed reduced hiring needs is a legitimate, non-discriminatory reason for the decision not to re-hire her.

### b. Experience

■ The record does establish that at least three of the journeyman laborers Rieth–Riley hired in 2008 did have significantly more experience than Ms. McBrian. Ed Smyk had eleven years of experience as a laborer for Rieth–Riley when the company re-hired him for the 2008 construction season. (Schaub decl. at ¶ 18.) Chris Kelly had approximately eighteen

years of job-related experience, including both work as a laborer and work operating heavy machinery on road construction projects. (*Id.* at ¶ 19 and Ex. 2.) Pete Prater had 4–5 years experience in asphalt paving when he was re-hired for the 2008 season, marginally more experience than Ms. McBrian. (*Id.* at ¶ 22.) This still leaves Michael Turner, David Campbell, James Anderson, Darren Everest, Frederick Looze, Jason Redman. The record clearly establishes that Mr. Redman did not have as much experience as Ms. McBrian. (*Id.* at Ex. 3.) The summary judgment record is silent as to the experience levels of Turner, Campbell, Anderson, Everest and Looze, but does reflect that Rieth–Riley first hired each of these individuals in 2005, a year later than Ms. McBrian. (docket # 23–3.) This certainly supports an inference that relative experience was not the whole story.

### c. Other Qualifications

█ On this record, the validity of Rieth–Riley's claim that some of the individuals it re-hired had unique qualifications that distinguished them from Ms. McBrian is mixed. The claim is accurate at least to the extent it applies to Pete Prater. Mr. Prater had moved into the position of Operating Engineer by the 2008 construction season, and he was a member of the Operators' union. (Schaub decl. at ¶ 22.) Ms. McBrian was not certified as an Operator and was not part of the Operators' union. (McBrian dep. at 207–208.) But with respect to Jason Redman, the evidence weighs in favor of Plaintiff. Rieth–Riley cites Jason Redman's skills with masonry, irrigation piping, and as a mechanic to differentiate him from Ms. McBrian. But there is no evidence in the record that Mr. Redman's masonry skills had anything to do with his qualifications as a laborer in pavement surfacing. Nor does the record support a claim that Mr. Redman's experience with irrigation piping was relevant or

distinctive. Indeed, Ms. McBrian herself completed a formal training program in pipe-laying principles and trench protection. (Sours dep. at 49.) Moreover, Rieth–Riley was not responsible for laying pipe in connection with its asphalt and cement projects in any event. (*Id.*) Only Mr. Redman's skills as a mechanic stand out as a potentially distinguishing attribute. Mr. Schaub refers to Mr. Redman as a "pretty good mechanic"—faint praise as a distinguishing characteristic for hiring—and notes that Mr. Redman worked as a mechanic for Rieth–Riley during the winter months. (Schaub decl. at ¶ 20). But Mr. Redman occupied one of the limited slots in the 2008 construction season as a road crew general laborer, not a mechanic. Rieth–Riley's failure to explain why they have attributed ten years of experience to Mr. Redman without any record evidence to support it further contributes to an inference of pretext. (Schaub decl. at Ex. 5.) Drawing all reasonable inferences in Ms. McBrian's favor, there is a genuine issue as to whether Rieth–Riley's explanation for its decision to put Mr. Redman in one of the few available slots as road crew general laborer is pretextual.

### d. Work Records

Including Mr. Redman, Ms. McBrian has identified five individuals whom the summary judgment record does not establish have greater experience than Ms. McBrian or special skills that distinguish them from Ms. McBrian. Nor does the record support Rieth–Riley's claim that the individuals it hired had better work records than Ms. McBrian. Indeed, Ms. McBrian's performance reviews improved steadily, and there is nothing in her 2007 review that suggests any problem with her work.

### e. EEOC Finding.

By letter of October 5, 2010, the EEOC through its Detroit Field Office notified

Ms. McBrian of "a determination by the District Director specifying that there is reasonable cause to believe that Title VII of the Civil Rights Act [of] 1964, as amended, has been violated with respect to [Ms. McBrian's] allegation of Failure to Hire/Rehire." (First Am. Compl., docket # 5, Ex. 1.) The EEOC letter is signed by the EEOC enforcement investigator and contains the agency's seal. (*Id.*) It is self-authenticated under F.R.E. 902(1), *Alexander v. CareSource*, 576 F.3d 551, 561 (6th Cir.2009), and may be admissible under F.R.E. 803(8), which creates a hearsay exception for "[r]ecords, reports, statements, or data compilations, in any form, of public offices or agencies, setting forth ... (C) in civil actions ... factual findings resulting from an investigation made pursuant to authority granted by law, unless the sources of information or other circumstances indicate lack of trustworthiness." *Id.* At least for summary judgment purposes, the EEOC determination reinforces the other record evidence that would permit a reasonable jury to find in favor of Ms. McBrian.

Drawing all reasonable inferences in Ms. McBrian's favor, there is a genuine issue as to whether Rieth–Riley's claim that the male individuals it hired for the 2008 season had greater experience, special desirable skills, or better work records is pretextual.

### 3. Post–Argument Submissions

Following oral argument, Rieth–Riley submitted not only a supplemental brief, but also a new declaration and exhibits that were not part of the summary judgment record (docket # 30). The Court had not intended that an extended briefing schedule permit either party to submit new evidence to the summary judgment record. All parties had a full opportunity to develop the summary judgment record before the hearing. The purpose of supplemental briefing was to permit a party to

call to the Court's attention how the existing record supported-or did not support-factual questions the Court raised at argument, particularly with respect to (1) how Rieth–Riley hired and assigned laborers among its various operational areas in the State of Michigan; and (2) how much relevant experience some of Plaintiff's comparative hires had (Messrs. Turner, Everest, Anderson, and Looze). Because Rieth–Riley chose to submit new evidence on these issues, rather than cite to the existing summary judgment record, the Court concludes that the summary judgment record at the time of argument does not include the evidence supporting Rieth–Riley's assertions on these points. On summary judgment, the inference would then have to be drawn in Plaintiff's favor, as previously discussed, leading to denial of summary judgment for Defendant.

But even if the Court were to consider the new material, the Court would still deny Defendant's motion for summary judgment. At most, the new evidence supports a claim that Rieth–Riley had a practice of hiring by operational area, rather than state-wide. But, as already noted, there is evidence in the record from which a jury could draw the opposite conclusion. On summary judgment, the non-moving party's view of the facts governs as long as it has evidentiary support. It does. Moreover, the supplemental information actually provides further support for Plaintiff in at least two respects. First, the supplemental information confirms that one of Plaintiff's comparators, James Anderson, had essentially the same experience level as Plaintiff in road work generally. Second, the supplemental information confirms that Rieth–Riley itself chooses to consider concrete work and asphalt work as functional equivalents in comparing the experience of Everest, Looze, and Turner. Indeed, the information suggests these comparators work pri-

marily or exclusively on concrete, not asphalt. If so, Rieth–Riley cannot credibly claim that concrete and asphalt both count when it comes to comparing the relative experience of Plaintiff and the male hires, but that asphalt and concrete are fundamentally different jobs when it comes to distinguishing Ms. McBrian's skill set as focused on only asphalt. At a minimum, the seemingly inconsistent positions generate a permissible inference in Plaintiff's favor on pretext.

## Conclusion

On this record, the application of the *McDonnell Douglas* structure reveals that genuine issues of material fact exist. The matter must proceed to trial.

**ACCORDINGLY, IT IS ORDERED:**

Defendant Rieth–Riley's motion for summary judgment (docket # 19) is **DENIED.**